UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

```
-----------------------------------
                                 :
BRUCE WOODS,                     :
                                 :
        Petitioner,              :
                                 :
    vs.                          :        CASE NO.
                                 :     1:00 CV 803
WANZA JACKSON, Warden,           :
                                 :
        Respondent.              :
                                 :
-----------------------------------
```

Deposition of:  BRYAN PERKINS

Taken:          By the Petitioner
                Pursuant to Notice

Date:           December 14, 2004

Time:           Commencing at 1:00 p.m.

Place:          119 East Court Street
                Cincinnati, Ohio  45202

Before:         Sherry L. Music
                Notary Public
                Commonwealth of Kentucky

1    APPEARANCES:
2
          On behalf of the Petitioner:
3
              Gregory W. Meyers, Esq.
4                  of
              Ohio Public Defender Commission
5             8 East Long Street
              Columbus, Ohio  43215-2998
6
                  and
7
              T. Kenneth Lee, Esq.
8             Assistant State Public
                   of
9             Office of the Ohio Public Defender
              8 East Long Street
10            Columbus, Ohio  43215
11                 and
12            J. Joseph Bodine, Jr., Esq.
                   of
13            State of Ohio
              Office of the Attorney General
14            Corrections Litigation
              150 East Gay Street
15            Columbus, Ohio  43215
16
17                       -  -  -
18
19
20
21
22
23
24
25

4c727fc3-f85d-4a22-9b9c-4cd6e8b1127b

Page 3

1                          I N D E X

2

    BRYAN PERKINS                                    PAGE

3

4       Direct Examination by Mr. Meyers              4

5

    EXHIBITS                        MARKED    REFERENCED

6

        Exhibit  1                      12         11

7       Exhibit  2                      17         17
        Exhibit  3                      48         48

8       Exhibit  4                      50         50
        Exhibit  5                      53         53

9       Exhibit  6                      55         55
        Exhibit  7                      65         65

10

11                          - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4c727fc3-f85d-4a22-9b9c-4cd6e8b1127b

Page 4

1                           BRYAN PERKINS

2    of lawful age, a witness herein, being first duly

3    sworn as hereinafter certified, was examined and

4    deposed as follows:

5                        DIRECT EXAMINATION

6    BY MR. MEYERS:

7         Q.    Bryan, I'm Greg Meyers -- we've introduced

8    ourselves -- along with Ken Lee and Jim Bodine.

9    We're here on Mr. Woods' case fresh out of your

10   distant past.  First, as long as you're the one under

11   oath, please give us your name and date you were

12   licensed as a lawyer.

13        A.    Bryan Perkins.  I was licensed as a lawyer

14   in 1994.

15        Q.    Just quick and skip stone rough, what has

16   been the nature of your practice in the last ten

17   years now?

18        A.    Primarily concentrating on criminal

19   defense work.  I'd probably say 90 percent of my work

20   has been criminal defense.

21        Q.    Misdemeanor and felonies?

22        A.    Misdemeanor and felonies, state and

23   federal.

24        Q.    Rough proportion as between the felony

25   work and nonfelony work?

Page 5

1          A.    Significantly more felony work than
2    misdemeanor work.

3          Q.    How about court-appointed and retained?

4          A.    Yes.   When I first started I did some
5    court-appointed work, and then once the business
6    picked up, probably after five years of practice I
7    gave up court-appointed trial work.   I still do some
8    court-appointed appellate work but I don't do any
9    court-appointed trial work.

10         Q.    So court-appointed appellate work is
11   something you have had, at least as part of your
12   practice, from basically the beginning, around '94,
13   roughly?

14         A.    Yes.

15         Q.    Obviously, you know we're here to take
16   about Mr. Woods, and you were gracious enough to
17   quite quickly provide us a copy of your old file.
18   That was a copy you gave to the staff people with the
19   public defender's office?   It was mailed?

20         A.    I believe it was, yeah.

21         Q.    Do you have the original here in your
22   office building?

23         A.    It would be in storage.   If I didn't send
24   the original then the original would be in storage.

25         Q.    When, roughly, if you can recall, did it

Page 6

1    come to your attention that there was ongoing

2    litigation over Mr. Woods' case?

3        A.    I would guess, roughly, maybe six, seven

4    months ago.

5        Q.    So as far as you knew, after the trial

6    went on in about '96; do you recall that?

7        A.    Yes.

8        Q.    Did you have a chance to look over your

9    file?

10       A.    Yes.

11       Q.    Anything else you might have looked at to

12   prep up for the kind of questions you might face here

13   today?

14       A.    Yeah.  After I was contacted I checked the

15   clerk's web site.  As far as the trial case and then

16   also the appellate case, checked the web site on

17   that.

18       Q.    Okay.  You and I haven't talked in any

19   detail except ministerial matters setting up today's

20   deposition?

21       A.    Correct.

22       Q.    I think when we were talking just last

23   week to set the date you mentioned you have talked to

24   Mr. Bodine?

25       A.    Yes, I have.

1       Q.   About the merits of the case.  So you know
2   what issues are before us today?
3       A.   Yeah, the issue of the appeal, trying to
4   get them to delay the appeal file.
5       Q.   How did you describe your recollections of
6   Mr. Woods and the work you did for him when you had a
7   chance to talk to Mr. Bodine?
8       A.   I do have a recollection of the case in
9   and of itself, a vague recollection of what it was
10  about, and I recall the trial and so forth, and some
11  of the things that happened after the trial.  And
12  then I pulled what documents I had in the file.
13  Since then there has been -- the partnership has
14  split, and so forth.  I thought that there was more
15  to the file than what I was able to recover but
16  that's all I have been able to find.
17      Q.   When we were just social chatting before
18  we went onto the record here, you mentioned -- was it
19  the first position you held was with a smaller firm
20  and now you're solo?
21      A.   Originally I was solo, and then I got
22  involved with a partnership, and then that ended and
23  now I'm solo again.
24      Q.   When you worked for Mr. Woods were you in
25  your partnership at that point; do you remember?

Page 8

1   A.   I don't recall.  If the trial was in '96

2   it would be close.  It would have been right at the

3   time it started or not being in it yet.

4   Q.   Okay.  From looking at the file -- and I

5   think my understanding is you or your staff were able

6   to send us a photocopy of the original.  What you

7   have looked at -- I see you had copies of handwritten

8   notes from the trial, the near person seats, the jury

9   seating chart, the stuff of a trial that was in

10  there?

11  A.   Right.

12  Q.   I didn't see anything about the money.

13  Because you were retained at trial; is that right?

14  A.   Correct.

15  Q.   And again -- deposition -- so I'll lead

16  you unless somebody gets angry about it on some of

17  these little things.  You weren't the first lawyer in

18  line.  Do you remember that?

19  A.   You mean he was represented by?

20  Q.   Yeah.

21  A.   Yeah, right.

22  Q.   You weren't the first lawyer for Mr. Woods

23  in the case that went to trial?

24  A.   Right.

25  Q.   Tell me what you can remember about how it

Ace Reporting Services   (513) 241-3200
30 Garfield Place, Suite 620   Cincinnati, Ohio  45202
4c727fc3-f85d-4a22-9b9c-4cd6e8b1127b

Page 9

1    came to pass you were engaged to represent him.

2         A.   I would have been -- I believe I was

3    contacted by somebody in the family and I could not

4    tell you who, but regarding that they were interested

5    in having me represent Mr. Woods.  I don't remember

6    exactly what transpired but I would have gone over to

7    the Justice Center, met with him and talked about his

8    case and so forth.

9         Q.   And justice center, for those who read

10   this transcript are not familiar with your county's

11   nomenclature.  That's your county jail?

12        A.   County jail, yes.

13        Q.   Which is across the street but connected

14   to the county courthouse?

15        A.   Right.

16        Q.   Where Mr. Woods was held in lieu of bond

17   on the charges he faced trial on?

18        A.   Correct.

19        Q.   I meant to make a note of this.  Your

20   office was somewhere on Seventh Street at the time?

21        A.   23 East Seventh Street.  And that would

22   tell me that I was in the partnership at that time.

23        Q.   Oh, okay.  Of course, we're at 119 East

24   Court Street but the Seventh Street address is also

25   within walking distance?

1          A.    Yes, it is.   It's just a couple blocks
2     away from the courthouse.
3          Q.    So somehow or the other, do you remember,
4     was it Bruce that might have called you from jail
5     collect?  Was it a family -- girlfriend?
6          A.    It probably was not Bruce if he was
7     incarcerated.   I probably would have talked with a
8     family member.   And I believe in his case most of the
9     contact I had was with a male family member but I
10    cannot recall his name.
11         Q.    If you recall, what was the financial
12    arrangement regarding your being retained for this
13    case?
14         A.    I don't recall what the fee would have
15    been in that case but I would have quoted him a fee
16    and usually requested that half of that be paid in
17    advance, at least, and then the balance paid within a
18    reasonable period of time.   What that amount is, I
19    could guess a ballpark but I couldn't tell you
20    exactly.
21         Q.    Let me show you a document I found in your
22    file that's not marked yet as an exhibit.   Is that
23    your handwriting?
24         A.    Yes, it is.
25         Q.    As you scan that, does it spark a

1  recollection as to what that may have noted or

2  recorded?

3      A.   As it relates to the fee?

4      Q.   And the whole case and possibly the fee.

5      A.   Looks like I would have quoted him a fee

6  of $4,000 and asked for fifteen hundred down.  That

7  would have been -- we would have talked and discussed

8  it.  And probably he indicated that he couldn't come

9  up with two thousand down but probably a family

10 member could pay fifteen hundred down.  That was my

11 note to myself to recall what we talked about.

12     Q.   As I look at that and was, I think, able

13 to make out most of your handwriting, would I be

14 correct that would seem to be a sheet of paper

15 perhaps recording notes from a first client meeting?

16     A.   That looks like something typical.

17 Because normally I will take down their inmate I.D.

18 number when I first meet with them.

19     Q.   Inmate's name, the mom's name is there?

20     A.   Right.

21     Q.   These numbers that you've referred to

22 regarding the retaining amount of money?

23     A.   Right.

24     Q.   It's a smattering facts of facts, very

25 initial rudimentary outline of a case pattern.

1          A.    Correct.

2          Q.    Let me take this opportunity to do

3     something I forgot at the beginning.  I'm trying to

4     think whether we sent -- we did send you a waiver by

5     Mr. Woods.

6          A.    You did.

7          Q.    To make it clear, professional to

8     professional, that you were authorized to share that

9     data with us.  Do you understand for purposes of

10    today in this litigation, which is, you're aware, is

11    over the appeal, the waiver is limited.  In other

12    words, we're not here today and I would object on his

13    behalf to protect his attorney-client privilege in

14    the event there were facts about the case itself that

15    went to trial.

16         A.    Right.

17         Q.    Anything he might have shared with you

18    directly is not a proper subject for today's

19    deposition?

20         A.    Correct.

21               (Exhibit 1 was marked for identification.)

22         Q.    Let me mark for identification as Exhibit

23    1 this single sheet of paper we've discussed.  Did

24    you provide Mr. Bodine with a copy of Mr. Woods'

25    file?

1    A.    No.

2    Q.    Joe, have you seen that?

3    MR. BODINE:  No, I haven't.

4    Q.    So somewhere -- I think we've refreshed

5  your recollection a bit -- your working address at

6  the time was on Seventh Street.  And that was, did

7  you remark, in a partnership affiliation?

8    A.    Yes, that address I would have been in a

9  partnership.

10    Q.    Give me a quick overview -- when you say

11  "partnership" was that you and --

12    A.    One other attorney.

13    Q.    Support staff?

14    A.    Yes.  How many we had at the time, I

15  cannot tell you, but it would have been at least one

16  secretary, two at the most.

17    Q.    How did you handle your money flow back

18  then?  In other words, was it your habit to have a

19  formal engagement agreement or a retainer contract?

20  You know, every lawyer has done it different over

21  time.  What was your routine?

22    A.    I guess, ideally, I probably had a

23  contract but I seldom used it.  I should have but

24  sometimes, you know, it is just an agreement that I

25  will have with my clients.

1    Q.    Sure.   I was explaining to my co-counsel

2  who has never been in private practice, that's the

3  way the business often runs out there.

4    A.    Correct.

5    Q.    Given your habits and routines, at least

6  back then -- I'll interrupt myself.  I don't think

7  that's dated, but if I told you other documents came

8  out of your file -- maybe your recollection, too, was

9  refreshed.  It looks to me like you formally began to

10  represent Mr. Woods around April of '96.  There is

11  some motion practice bearing your name coming into

12  the record around April of '96; is that --

13    A.    That would sound about right.

14    Q.    Would it have been your routine and habit

15  to refrain from formal filing of motions, at least

16  until you got the amount of the fee that you had

17  indicated was necessary to get you going?

18    A.    No.  Once I would enter my appearance on

19  the case then I would do whatever was -- I normally

20  would not enter my appearance on the case until I

21  was -- at least received the initial retainer.

22    Q.    Once you entered the appearance it was

23  your practice or routine, professionally, to see it

24  through?

25    A.    Correct, unless for whatever reason I

1   would file the motion to withdraw or something of

2   that nature.

3          Q.   Right.  And such a motion did not appear

4   in the docket as we were able to see?

5          A.   No.  I followed it all the way through to

6   trial.

7          Q.   When you looked back over your file were

8   you reminded of the fact that Mr. Woods had, what at

9   least in the Federal Rule, I guess would be called a

10  superseding indictment?

11         A.   That is one of the issues that I had not

12  remembered until I did review the file.  And then I

13  did recall that there was actually some confusion

14  before the trial began about that issue, and that

15  brought some memories back.

16         Q.   Let me show you -- just so we're on the

17  same wave length here.  These documents I'm going to

18  show you come straight out of the court file.  These

19  are two of several documents.  I noticed,

20  for example, starting about in early April there

21  appeared your demands for discovery, bill of

22  particulars.  Here, for example, let me show you

23  this.  We might mark this.  Here on April 4, '96, do

24  you recognize that appears to be a letter from you to

25  Mr. Woods?  He's incarcerated at the time?

1        A.    Yes.

2        Q.    And it is indicating there is a set of

3    copies of some motions you're filing?

4        A.    Correct.

5        Q.    Of course, that confirms, if you will,

6    that whatever the exact exchange of money for your

7    time and expertise was you were satisfied by early

8    April '96 that you would indeed enter and represent

9    Mr. Woods?

10       A.    Correct.

11       Q.    And the case number on that letter is

12    what?

13       A.    B 96 1386.

14       Q.    1386?

15       A.    Correct.

16       Q.    A higher number than B 345, correct?

17       A.    Correct.

18       Q.    Is it your understanding in Hamilton

19    County that the case numbering system in the clerk's,

20    at least at that time, would include the year,

21    calendar year, the last two digits, then would be

22    sequentially numbered?

23       A.    Correct.

24       Q.    So, just to talk more than even the

25    transcript needs to show, but the 345 is earlier than

Page 17

1    the -- what did I say?   19?

2           A.    1386.

3           Q.    1386?

4           A.    Yes, it is.

5                 (Exhibit 13 was marked for

6                 identification.)

7           Q.    I'll mark this letter dated April 4, '96

8    with Exhibit 2.   Then, just to elaborate a touch

9    further, do you notice the two pleadings before you,

10   each captioned Motion for Continuance, one bearing

11   the 345 number and one bearing the 1386 number?

12          A.    Yes.

13          Q.    And the one bearing the 345 number

14   basically refers by reference to the more detailed

15   reasons set forth in the 1386 as to why you're

16   requesting the court to grant a continuance?

17          A.    Correct.

18          Q.    Did you have a chance to look at -- back

19   at those indictments to refresh your recollection as

20   to what the difference was?

21          A.    No.   I just noticed that there were two

22   different numbers that related to the same offense

23   but the exact differences, I did not notice.

24          Q.    Again, let's see if I can put my finger on

25   it quick.   Just so someday a reader can make sense

1   out of this.  Just scan, if you would, the 1386, does

2   that appear to be a copy of an indictment as you

3   were familiar with the system of Hamilton County back

4   then?

5        A.   Yes.

6        Q.   A seven-count indictment?

7        A.   Correct.

8        Q.   Does this appear to be -- 345, also a

9   seven-count indictment?

10       A.   Yes.

11       Q.   Do me a favor real quick.  And again, I

12  appreciate the fact that your relationship with this

13  case as a witness is far different than we as

14  counsel.  If you check quick between the two would

15  you note that it would appear the distinction is

16  they've added the specification of what at the time

17  was called prior offense of violence to elevate the

18  potential penalties?

19       A.   Yes, it does appear to be that.

20       Q.   The first indictment has what was called

21  then and I guess today, as well -- it's called the

22  gun spec or gun specification.  They decided to up

23  the ante a bit with the additional spec to increase

24  the top end of the old penalty system; is that fair

25  enough?

1      A.    That's correct.

2      Q.    So as indicated then by the Motions for

3   Continuance, you clearly at that time, were aware

4   that there were numbers but the one that really

5   merited some attention you were going to trial on was

6   1386?

7      A.    Correct.

8      Q.    In your practice, generally, have you seen

9   that kind of situation where a prosecutor, after a

10  first indictment, decides to go back to the grand

11  jury for whatever reason and you wind up with a

12  situation not unlike what you faced with Mr. Woods?

13     A.    I'd say in the state it's not that common,

14  but yes, I have seen it.

15     Q.    Certainly in the federal world the gimmick

16  is -- maybe a defense lawyer might call it

17  superseding indictments -- is pretty common in the

18  federal format?

19     A.    That's correct.

20     Q.    So here for a long while you were

21  operating under two case numbers with your primary

22  focus.  If I told you the records would reveal that

23  your motion practice, your discovery demands bill of

24  particulars two notices of alibi, one amending --

25  second amending the first.  They were all going in

1    under the 1386. Does that sound correct or do you

2    want to go through with these pieces of paper?

3          A.   I would agree with that.

4          Q.   I think the record will pretty well speak

5    to that. Do you remember, off the cuff, roughly, how

6    many trials you would have had before this one? You

7    were practicing a couple years by then. Or a year

8    and a half, really. Did you get licensed in the fall

9    of '94?

10         A.   Let me think here. Yeah.

11         Q.   Some people are on the spring licensure,

12   some are on the fall licensure.

13         A.   Maybe I was licensed in the fall of '93

14   because I graduated from law school in the spring of

15   '93. I took the bar in July. So, yeah, I would have

16   been licensed for a couple months in '93. I'm sorry.

17   So I would have been licensed all of '94.

18         Q.   So actually you're coming on two and half

19   a years, rough, of practice by the time the jury is

20   boxed in, roughly, June of '96?

21         A.   Correct.

22         Q.   How many trials by then, roughly?

23         A.   Do you want me to break it down?

24         Q.   Yeah. Some lawyers can go to trial more

25   often than others. Were you doing two a year or

1  eight a year?

2      A.   I'd say it was probably -- probably doing

3  eight to ten a year.

4      Q.   Were you?

5      A.   Yeah.

6      Q.   That makes for some long hours, doesn't

7  it?

8      A.   Oh, yes.

9      Q.   So you weren't, obviously, green any

10  more --

11     A.   No, I would not say I was green at the

12  time.

13     Q.    -- when you took this one to trial.

14  When you looked back over this file and whatever

15  recollections have been prompted to this very

16  question, do you recall whether Mr. Woods was the

17  kind of client who would, for lack of a better

18  phrase, given you financial trouble?  You know how

19  some clients will cough it up quite quick and stay

20  true to agreements and others are kind of always

21  behind on their payments or there's a lot of if-come

22  promises that never come true?

23     A.   I believe there was some problems as far

24  as getting the tail end of the fee.  But other than

25  that I don't have any specific memories.

4c727fc3-f85d-4a22-9b9c-4cd6e8b1127b

Page 22

1    Q.   Up through about the middle of '96 in your

2  practice, back then, I think as you have told us, you

3  were doing certainly more court-appointed trial work

4  since you eventually got to the position you didn't

5  need to take any more of that; is that right?

6    A.   Right.

7    Q.   Good way to build a practice but you can't

8  hardly pay your overhead with what they pay a

9  court-appointed.  That's certainly true in Franklin

10 County.

11   A.   Right.

12   Q.   How about the appellate appointments?

13 Were those coming in fairly regularly for you from

14 the very beginning?

15   A.   I would say that the appellate was more

16 limited in the beginning than was the trial.  It was

17 much more trial than it was appellate work,

18 primarily, because most of my court appointments at

19 that time came from what they call a PD day where you

20 would go down to the arraignment court one day out of

21 the month and they would hand you five or six cases

22 to deal with at that point.  So most of the

23 appointment cases I did were at a trial level.

24   Q.   You had done appeals, though, by after the

25 first two and a half years of practice?

Page 23

1      A.    Yes, but I would say that they were

2    limited.  If I had to guess, I'd say probably less

3    than ten felony appeals in the first couple years of

4    practice.

5      Q.    For what it's worth, certainly in my

6    experience, I know a lot of trial lawyers will cut

7    the line.  They won't even touch an appeal.  You were

8    willing to do both?

9      A.    Yeah, I still do enjoy doing appeals now.

10      Q.    Just a lingering thought, a bit redundant:

11    in the file copy we got I saw a -- but-for what's

12    been marked Exhibit 1, I didn't see any other notes

13    that, to my eye, alluded to the finances of the

14    professional agreement.  Would that have been

15    unusual?

16      A.    No, it would not have been unusual.  It

17    probably would have been just verbal agreements.

18      Q.    When you would have a discussion with a

19    trial level client and reach in your own mind, of

20    course, first this is what this would cost me to do

21    it, this is what I am worth, here's my fee, and they

22    agree.  In that kind of conversation with a felony

23    criminal trial defendant, would it have been your

24    habit to discuss the appellate work in the event

25    there was a conviction at trial or was that not a

1    topic on the radar screen -- if I could mix

2    metaphors -- during the first money discussions?

3        A.   No, that would not have been discussed at

4    the trial level.  At the most, there would have been

5    a discussion, well, if I am convicted then what is

6    the recourse after that.  And then I would explain

7    the appellate process.  But I have never talked with

8    a client -- you know, if you are convicted this is

9    what the appeal will cost and how it would need to be

10   taken care of.

11       Q.   If nothing else, perhaps on the

12   professional end and business level it is not good

13   marketing to tell a criminal felony client you're

14   thinking about the fact of failure.

15       A.   I would always hope that he would not need

16   an appeal.

17       Q.   A lot of folks, I think, that need our

18   services as felony trial lawyers perhaps might not

19   take that as a positive sign if we're trying to talk

20   to them about defeat before we're even really ready

21   to fight?

22       A.   Correct.

23       Q.   So discussion about, certainly, the money

24   end of an appeal would not have come up?

25       A.   No, not at all.

Page 25

1      Q.    How about afterwards?  Afterwards by which
2   I mean after the jury found him guilty.  What do you
3   remember there in Mr. Woods' case?
4      A.    I remember he was convicted and sentenced,
5   and I remember we talked and he did want to proceed
6   on appeal.  I did talk to him about what the fee
7   would be.  And then my communications at that point,
8   then, got back to family members.  And if I am
9   recalling correctly, I was contacted by more than one
10  person asking, well, what's the fee going to cost and
11  so forth.  Then there was also discussions with the
12  court reporter about what their cost was going to be
13  and so forth.  And I believe I related that
14  information to whoever I was speaking to at the time.
15     Q.    Would it have been common or uncommon in
16  the situation that -- at least as I would imagine it,
17  hence, the question for you to tell me whether this
18  is right or not -- but Mr. Woods would have been
19  shipped out of the county not too long after he was
20  sentenced?
21     A.    Probably about within 30 days of being
22  sentenced he would have been sent out of the county.
23     Q.    Back in '96 to one of the correction
24  reception centers, maybe the one up in Orient, some
25  distance away?

1      A.    Correct.

2      Q.    And hence, the communication with family

3 about what comes next would have certainly been

4 easier, I would imagine, than talking directly with

5 Mr. Woods?

6      A.    Correct.

7      Q.    Would you take collect calls from him or

8 other inmates at the time?

9      A.    At one point I did, but I know that on and

10 off there has been problems with the phone actually

11 being able to take -- the phone system we had being

12 able to take incoming calls.  I had, originally, when

13 I set up on Seventh Street my hope was to be able to

14 do that because, actually, where I was prior to that

15 was here, and I didn't own the phone system, had no

16 control of it, so we could not get collect calls

17 coming through.  But even when I moved there was a

18 period of time there was problems with collect calls

19 coming in.  I would doubt if I ever talked to

20 Mr. Woods over a collect telephone call.

21      Q.    And in part, again, just to throw it out

22 for you, I know for some in private practice part of

23 the collect call issue in addition to the functional

24 equipment, if you will, is a business -- a legitimate

25 business concern.

1      A.    Sure.

2      Q.    You can rack up a tremendous amount of

3  money-taking calls that may just be looking for free

4  comforting time on the phone.

5      A.    And that was a problem I ran into once we

6  got the bugs worked out and collect calls were coming

7  in, then the word got around at the justice center,

8  this office accepts collect calls and everybody was

9  calling for free advice.  So it really didn't work

10  out that well.

11      Q.    So in the time frame around the summer of

12  '96 you didn't have the equipment capacity to receive

13  the collect calls?

14      A.    I believe, since that was close to the

15  time of moving into that building, there were

16  problems with collect calls being able to come in.

17  So I don't believe I had the capacity to receive

18  collect calls at that time.

19      Q.    Then when you eventually did -- and I

20  think we had our little, kind of, agreement that then

21  you can get that money issue going, if there's too

22  many people coming in it ties up the phone.  And lot

23  of folks have never been in private practice don't

24  realize the money hit and the time hit?

25      A.    Correct.

1    Q.   Was that phenomenon or that experience

2    over on Seventh or did that occur when you got over

3    here?

4    A.   No, I never had that problem here because

5    however the system works here, those calls don't come

6    through.  So I don't get collect calls at this

7    location.

8    Q.   How long did you stay at the Seventh

9    Street location?  When did you move out of there, if

10    you can remember?

11    A.   A close guess would be 2000 to 2001.  That

12    was when the partnership ended.  And then I would

13    have moved back here.

14    Q.   And it started up around the time, you

15    think, of this trial?  Around '96 sometime that you

16    would have been at that address?

17    A.   Yes.

18    Q.   Was there a time there, then, at the

19    Seventh Street address where the equipment issues

20    relative to collect calls were resolved in favor of

21    your ability to receive them and then sort of the

22    flood of collect calls caused what?  A change in the

23    way you would instruct your staff on your own with

24    respect to accepting those calls?

25    A.   Correct.  I can't tell you the date that I

Page 29

1  would have been starting to be inundated with collect

2  calls.  But it probably would have been in '97 or

3  '98, I'd say, I know it was working and there became

4  problems with it.

5        Q.    Problems of volume?

6        A.    Correct.  Correct.  And then essentially

7  how we dealt with it was the staff would not accept a

8  collect call unless one of us told them in advance

9  that somebody may be calling.  This is their name.

10  We want a collect call.  If they weren't instructed

11  to accept it then it was declined.

12        Q.    Do you have a recollection one way or

13  another whether you would have ever instructed your

14  staff to accept a collect call from Mr. Woods?

15        A.    I have no recollection of that but I

16  really have no recollection of having any discussions

17  with Mr. Woods on a collect-call basis.  It could

18  have happened but I just don't recall that.

19        Q.    A bit ago you mentioned how -- relative to

20  what got marked as Exhibit 2 and the letter of early

21  April '96 and then some of the motion practice, that

22  those type of activities, understandably don't occur

23  until you're satisfied on the business end.  You're

24  not just flat out giving your time away unless it's a

25  case you want to play pro bono on.  Otherwise you're

Page 30

1   not going to move until you have been paid.  At least

2   something towards your ultimate fee?

3        A.   Correct.

4        Q.   And I take it the same would be your

5   business practice with respect to appellate work?

6        A.   Correct.

7        Q.   And this is -- Mr. Woods is a case, I

8   think you said you do recall after the trial

9   conviction having conversations, certainly with him.

10  At least one, maybe?  Did you have a conversation

11  with him at least he was aware of his right of a

12  appeal, I take it?

13       A.   Yes.

14       Q.   And he made it clear he wanted an appeal?

15       A.   Correct.

16       Q.   Again, understanding the limit that --

17  privilege here.  And I don't mean to poke a hole in

18  the tale, he either told you or didn't tell you, but

19  I take it he wasn't too happy he got convicted?

20       A.   Correct.

21       Q.   He obviously wasn't unhappy with you.  He

22  wanted to you keep fighting for him on the appellate

23  level?

24       A.   Correct.

25       Q.   And then there were conversations with, as

Page 31

1   you generally recall -- this is eight years ago now,

2   eight-plus years?

3       A.   Correct.

4       Q.   Coming back to the summer of '96, there

5   were conversations probably with more than one person

6   on his behalf?

7       A.   I believe there was, yes.

8       Q.   And the fact that one person was a male

9   sticks out a bit?

10      A.   That does.  For the life of me I couldn't

11  tell you what his name was, but I do recall that at

12  least one of the individuals I dealt was a male.

13      Q.   And would you have created another Bruce

14  Woods file, per chance, for appeal versus the file we

15  got from you?

16      A.   Eventually if I would have been retained

17  and followed through with the appeal there would have

18  been another.

19      Q.   You would have briefed the whole thing up.

20  But in this type of situation, from what you saw in

21  your file that got copied for us, is it your

22  testimony that you would not have created a separate

23  appellate file?

24      A.   In this situation, no, I would not.

25      Q.   I saw nothing, as I think we've already

Page 32

1    mentioned with respect to Exhibit 1, at least to my

2    eye -- and this was the only document that seemed to

3    have reference to retainer fee.  And I should stop to

4    say, of course, I make this mistake as a lawyer.  I

5    am not testifying, you are.  And you've got to tell

6    me if you want to stop and look at your original or

7    look at what we brought again.  But my precise

8    question is, do you recall or is there a notation

9    somewhere about the money discussions relative and

10   relevant to retaining you to do the appeal?

11        A.   No.  When I looked through the file there

12   was not anything regarding the financial arrangements

13   regarding the appeal.  I probably would have

14   discussed it with him and not made a note of it.

15        Q.   Do you have a recollection of what the fee

16   structure would have been for the appeal?

17        A.   Not specifically.  It probably would have

18   been somewhere from six to eight thousand, just going

19   back in my memory of what I was charging at that time

20   for what I would ask for on an appeal.  But I don't

21   have any -- I couldn't tell you specifically.  I told

22   them, this is the amount for the appeal.  This is how

23   much I need up front.  This is how much I need for

24   the court reporter.  I do not have a recollection of

25   that.

1    Q.   Would you have normally discussed an

2   appellate fee in a lump sum or would you have said

3   something like six to eight grand, plus the

4   transcript?  Or would you have understood in your own

5   head out of the six to eight you will wind up paying

6   for the transcript?

7    A.   No, I would have separated out whatever

8   the -- it would have been six to eight for the appeal

9   plus the course of the transcripts.

10    Q.   So given the time investment of doing a

11   direct appeal, that six to eight appears to be more

12   than what you expected for your trial?

13    A.   Correct.

14    Q.   And your recollection, I think earlier was

15   if there were money problems -- when I asked you the

16   question does Bruce ring a bell in your recollection

17   as a money problem where you got it quick and got it

18   up front -- I think you remarked that maybe towards

19   the end the money wasn't coming in the way you had

20   expected it to come in?

21    A.   Yeah.  Maybe, and that's just sticking out

22   in my mind, but I couldn't tell you how much he still

23   owed on that amount.  But again, that wouldn't have,

24   obviously, whatever he paid, satisfied me to take

25   care of the trial aspect of it.

1      Q.   Sure.  I mean, you did not move to

2   withdraw?

3      A.   No.

4      Q.   I think most judges understand that a

5   lawyer in private practice often does face a

6   legitimate need.  You can't go through a coerced pro

7   bono, is what I used to call it.

8      A.   Right.

9      Q.   You feel the tug as a professional because

10  you're in the case, but you can't afford a full blown

11  felony trial as a freebie?

12     A.   Correct.

13     Q.   So, was it Judge Cooper, was this judge?

14  I'm sorry.

15     A.   Connor.

16     Q.   Would he have been the kind of judge who

17  would have entertained a motion to withdraw on that

18  reason?

19     A.   I don't believe he would have.  What I

20  recall, because I remember coming onto the case and

21  when the case was set for trial, and I do recall the

22  judge not be being happy at all about continuing the

23  case.  I do remember -- that sticks out in my mind.

24  So I think had I come to him and said, hey, I would

25  like to withdraw, but really have no recollection of

4c727fc3-f85d-4a22-9b9c-4cd6e8b1127b

1    me even having the desire to do that.

2         Q.   I saw from the file and, of course, the

3    superseding indictment talks about the specification

4    of the prior offense of violence.  So by the time you

5    were representing Mr. Woods he had at least a robbery

6    conviction when he was in his late twenties, I

7    believe 29?

8         A.   Yes.

9         Q.   Sometimes -- I assume it would be your

10   experience -- sometimes when you are in private,

11   being retained, you know the money is coming from the

12   guy you're actually representing and sometimes you

13   know it is coming from somebody else?

14        A.   Right.

15        Q.   I trust you have had that experience?

16        A.   Correct.

17        Q.   At times that can be in the inner phase,

18   where you've got to make sure the money payer knows

19   you represent the client, not the money, so to speak?

20        A.   Correct.

21        Q.   In this case do you have a recollection as

22   to whether Mr. Woods himself that he was doing some

23   part time low-end legal work?  I don't know what else

24   he did.  I'm not asking.

25        A.   No, it would have came from a third party.

1    I'm almost certain it would not have come from him.

2        Q.    But for -- the word benefactor is probably

3    inappropriate here because lot of people have friends

4    or family who would want to help them when it comes

5    to hiring us as lawyers.  But he himself, basically

6    would have been the profile of an indigent but for

7    the benefactor?

8        A.    Correct.

9        Q.    And that remained true -- if that were

10   true, at the trial stage when he was in jail in lieu

11   of, I think the record shows a $200,000 bond, it was

12   all the more true after being convicted and walloped

13   pretty hard on the sentencing end of this thing?

14       A.    Correct.

15       Q.    By that time you had done appointed

16   appellate work?

17       A.    Yes.

18       Q.    So you knew that drill, I take it?  It

19   wasn't your first appeal?

20       A.    No.

21       Q.    You knew what it takes to perfect an

22   appeal in terms of notices of appeal and copies of

23   judgments appealed from?

24       A.    Correct.

25       Q.    Had you worked appointed appeals before as

Page 37

1    well as appointed trials?

2         A.    I would have.  I couldn't venture to tell

3    you how much, but there would have been some, yes.

4         Q.    And again, on a collegial basis, to the

5    extent we can, there are a lot of trial lawyers won't

6    touch an appeal.  You knew how to do both.

7         A.    Correct.  I like to think I know how to do

8    both.

9         Q.    There you go.  Nobody is perfect.  So here

10   there was a notice of appeal filed?

11        A.    Correct.

12        Q.    You have looked at these records?

13        A.    Correct.

14        Q.    You know there's a problem with that?

15        A.    Correct.

16        Q.    Do you know what the problem is?

17        A.    The problem is it was filed under the

18   wrong case number.

19        Q.    When did that come to your attention?

20        A.    When I was reviewing the file six or so

21   months ago.

22        Q.    Sort of another kind of what seems to be

23   series of -- I don't know if a problem is the word or

24   it looks like -- have you seen all of those papers in

25   the appellate record or you want me to hand you a

1    stack of them?

2         A.    I recall reviewing the Notice of Appeal.

3    I don't recall reviewing other things but I probably

4    did.   I know there would have been a docket statement

5    because I remember talking to the court reporter

6    about the docket statement.

7         Q.    Eventually -- and again, to talk,

8    sometimes at least I want to err on the side of

9    knowing a reader someday might read this first and

10   not the whole rest of the file.   But eventually,

11   do you now understand that the first lower case

12   number 345 was eventually nollied out, or dismissed

13   out?

14        A.    Yes.

15        Q.    And that didn't even happen until you were

16   in trial?

17        A.    Correct.

18        Q.    Again, I have run into that before.

19   Everybody, the judge included, is looking at 1386 and

20   it looks like right at the end of the trial.

21   Probably a prosecutor finally realized we've got to

22   clean this up, Judge, let's get rid of this case?

23        A.    Correct.

24        Q.    All the motions had all been in in the

25   1386, what have you, and it's dismissed out, and

1    obviously he is convicted.  And court files will show

2    us what I am showing you for reference point here.

3    Under 1386 on June 14 of '96, the sentencing entry

4    went on and that starts the clock ticking for appeal?

5        A.    Correct.

6        Q.    Eventually -- other than, sort of, what

7    we've discussed and I have poked around in terms of,

8    you know, Bruce is shipped out, or if he is over

9    there you've got that collect call block thing going

10   on from the equipment issues, you remember talking to

11   a man, maybe more than one person about ponying up

12   the fee for direct appeal for Bruce's conviction?

13   Any other recollections along that sort of

14   post-conviction time line that you want to bring out

15   here today?

16       A.    The only other recollection I remember is,

17   like I said, going to the court reporter, getting the

18   docket statement filed and her indicating, hey,

19   before I do anything I need this money up front.  And

20   then that information being related to whoever I was

21   dealing with.  That's about all I have a recollection

22   about that post conviction sort of period.

23       Q.    Okay.  Because the appellate clock starts

24   ticking on the 14th and then a Notice of Appeal is

25   filed on July 12th?

1    A.    Correct.

2    Q.    That's got your Seventh Street address on

3    it.  You would have had secretarial-type support at

4    the time?

5    A.    Yes.

6    Q.    Were you computer savvy, as they say in

7    the trade?  Were you generating a lot of your own

8    stuff or were you relying on delegation of duty?

9    A.    At that time relying more on support

10    staff.  Eventually I had learned to become more

11    computer savvy, but at that time I would have been

12    relying on support staff.

13    Q.    I noticed somebody cut and pasted this

14    out.  It's got Bruce, it's got the original, the

15    first case number and inadvertently, as we all do at

16    times, has a different client in the text.  It hardly

17    matters.  But I guess what does matter though is it

18    tapped into the wrong procedural pipeline with the

19    wrong case number?

20    A.    Correct.

21    Q.    But it was filed on time?

22    A.    Yes.

23    Q.    July 12.  This wasn't even filed in until

24    the month before.  So at least something is rolling

25    there to indicate at that point, an intention to

4c727fc3-f85d-4a22-9b9c-4cd6e8b1127b