1                    IN THE UNITED STATES DISTRICT court

2                       SOUTHERN DISTRICT OF OHIO

3                           WESTERN DIVISION

4                              - - -

5

6    BRUCE WOODS,                    :CIVIL ACTION NO. 1:00cv803

7              Petitioner,      :

8         Vs.                   :

9    WANZA JACKSON,             :

10             Respondent.      : .

11

12                             - - -

13

14        The deposition of **BRUCE WOODS**, Plaintiff herein,

15   taken as on Cross-Examination by the Defendant, pursuant

16   to the Federal Rules of Civil Procedure, notice and

17   agreement of counsel to take deposition at the Warren

18   Correctional Institute, State Route 63, Lebanon, Ohio

19   45036 on Wednesday, April 20, 2005, 10:30 a.m. before

20   Shandy Ehde, a court reporter and Notary Public.

21

22

23

24

25

```
 1    APPEARANCES:

 2                    ON BEHALF OF THE PLAINTIFF:

 3                    GREGORY W. MEYERS, ESQ.

 4                    Ohio Public Defender's Office

 5                    8 East Long Street

 6                    Columbus, Ohio 43215

 7                    ON BEHALF OF THE DEFENDANT:

 8                    STUART A. COLE, ESQ.

 9                    JERRI FOSNAUGHT, ESQ.

10                    Attorney General's Office

11                    150 E. Gay Street

12                    Columbus, Ohio 43215

13                           - - -

14              It is stipulated by counsel for the respective

15    parties that the foregoing deposition may be taken at the

16    time and place stated pursuant to the Federal Rules of

17    Civil Procedure and notice and agreement of counsel to

18    take deposition, that proof of the official character and

19    qualification of the notary is waived; that the

20    deposition may be taken in stenotypy by Shandy Ehde,

21    Registered Professional Reporter and Notary Public in and

22    for the State of Ohio and transcribed by computer out of

23    the presence of the witness and submission to the witness

24    for examination and signature was waived.

25
```

3

1                                EXHIBITS

2       1    Affidavit                        10

3       2    Notice of Appeal                 31

4       3    Entry dismissing appeal          31

5       4    Letter dated 2/6/98              33

6       5    Memorandum dated 2/6/98          34

7       6    Letter dated 5/31/98            35

8       7    Letter dated 5/26/98            35

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               BRUCE WOODS

2   plaintiff herein, being first duly sworn as hereinafter

3   certified, was examined and deposed as follows:

4                   CROSS-EXAMINATION

5   BY MR. COLE:

6          Q.    Morning, Mr. Woods.  My name is Stuart

7   Cole.  I'm here representing the Ohio Attorney General's

8   Office, representing the respondent and warden in this

9   case.  You're here with your attorney, Mr. Meyers, from

10  the Ohio Public Defenders Office.  We're here to take a

11  deposition in the habeas corpus action which you brought

12  in Case No. 1:00cv803; is that correct?

13         A.    Yes, it is.

14         Q.    How have you prepared for this deposition

15  today?

16         A.    Other than getting a letter saying that you

17  was going to be here --

18         Q.    You haven't reread any of the pleadings

19  filed by the parties then?

20         A.    I read Mr. Perkins' deposition.

21         Q.    You did read Mr. Perkins' deposition?

22         A.    Yes.

23         Q.    Was there anything in Mr. Perkins'

24  deposition that you felt was incorrect, disputed?

25         A.    Maybe some minor things.

1        Q.    Such as?

2        A.    Just minor.  I can't remember offhand.

3        Q.    Nothing relating to the sum and substance

4    of your claims in this case?

5        A.    I don't think so.

6        Q.    Okay.  How old are you, Mr. Woods?

7        A.    Thirty-eight.

8        Q.    You're from Cincinnati; is that correct?

9        A.    Yes.

10       Q.    Did you graduate from high school?

11       A.    No.

12       Q.    What was the last grade you completed?

13       A.    Tenth.

14       Q.    You can read and write?

15       A.    Yes.

16       Q.    In your petition, correct me if I'm wrong,

17   you're challenging your current conviction, that of

18   aggravated burglary, robbery and kidnapping?

19       A.    Yes.

20       Q.    Is this your first felony conviction?

21       A.    No, sir.

22       Q.    What was your first felony conviction?

23       A.    I don't know.

24       Q.    Perhaps if I refresh your recollection,

25   could it have been a robbery in December of 1985?

1          A.    That could be correct.

2          Q.    Do you recall whether or not you pled

3    guilty or actually had a trial in that case?

4          A.    I pled guilty.

5          Q.    Do you remember who your attorney was?

6          A.    No.

7          Q.    Did you appeal that conviction?

8          A.    I don't remember.

9          Q.    You may have?

10         A.    No, I don't remember if I appealed it or

11   not.  I don't think so, though.

12         Q.    Okay.  What was your -- Have there been any

13   other additional felony convictions except for that

14   robbery conviction?

15         A.    Yes.

16         Q.    What was that?

17         A.    I had trafficking marijuana and receiving

18   stolen property.

19         Q.    And when was that conviction?

20         A.    Where was it at?

21         Q.    When?

22         A.    '91.

23         Q.    If I were to tell you it was August 13th,

24   1991, you wouldn't dispute that, I take it?

25         A.    You said '91?

1          Q.    I'm saying August 13th, 1991.

2          A.    That sounds correct.

3          Q.    Did you plead guilty or not guilty, if you

4    recall?

5          A.    On the trafficking marijuana, I think it

6    went to trial.

7          Q.    Was it a jury trial?

8          A.    Yes.

9          Q.    And you were found guilty.  Who was your

10   attorney in that trial?

11         A.    I don't remember.

12         Q.    Were these two attorneys in your first and

13   second trial retained or appointed, if you recall?

14         A.    The second one was, he was appointed.  The

15   first one was, too.

16              MR. MEYERS:   Just to clarify, when you

17              say first and second, we're referencing the

18              '85 and '91.

19              MR. COLE:   The '85 robbery and the

20              1991 trafficking marijuana.

21              MR. MEYERS:   Okay.

22         Q.    The trafficking marijuana, did you appeal

23   that conviction?

24         A.    I don't remember.  I doubt it, though.  I

25   don't remember.

1          Q.    So if you did appeal it, you remember
2     nothing whatsoever about the appeal; is that your
3     testimony?
4          A.    Yes.
5          Q.    Okay.  That brings us to your current
6     conviction.  You were represented by Mr. Brian Perkins;
7     is that correct?
8          A.    Yes.
9          Q.    And how did it come that Mr. Perkins became
10    your attorney?
11         A.    Well, he showed up at the Justice Center
12    one day, and then he was like -- he talked to some of the
13    family, they told him a little about the case.  We got to
14    talking and he became my lawyer.
15         Q.    Did somebody hire him or did he just show
16    up one day?
17         A.    He talked to somebody and then he showed
18    up.  And after we talked about the case, he was like,
19    this is what I need.
20         Q.    You say he talked to somebody.  Who did he
21    talk to?
22         A.    I think it was my mother.
23         Q.    So he talked to a member of your family?
24         A.    Right.
25         Q.    A member of your family hired him?

```
 1            A.    Not until after we talked.

 2            Q.    Okay.  You talked to him and then a member

 3      of your --

 4            A.    He told me, he said, this is how much money

 5      I need.  Once this is dropped off, then we'll --

 6            Q.    How much money did he need?

 7            A.    The first time.

 8            Q.    (Nodded.)

 9            A.    $1,500.

10            Q.    So he told you he needed $1,500?

11            A.    Yes.

12            Q.    And your mother paid him the $1,500?

13            A.    I believe so.

14            Q.    And then he represented you through trial?

15            A.    He came back again, we talked about the

16      case, what might happen, and then he started representing

17      me.

18            Q.    Was his total fee $1,500?

19            A.    No.

20            Q.    More?

21            A.    The total fee was like 5,000.

22            Q.    And who paid him the $5,000?

23            A.    It wasn't paid, the whole 5,000.

24            Q.    Do you know how much he was paid?

25            A.    Maybe 3,000.
```

1          Q.     Okay.  And who paid him this $3,000?

2          A.     Family members.

3          Q.     Well, you mentioned your mother.  Anybody

4    else pay him, that you know about?

5          A.     Cousin might have paid.

6          Q.     Okay.  So your mother and cousin paid him

7    about $3,000 to the best of your knowledge?

8          A.     Correct.

9          Q.     And to the best of your knowledge, he was

10   not fully paid?

11         A.     No.

12         Q.     And this $5,000 was to represent you

13   through trial?

14         A.     Yes.

15         Q.     Did he ever threaten to withdraw from

16   representing you throughout the trial because he hadn't

17   been paid?

18         A.     No.

19         Q.     Were you generally satisfied with his

20   performance as defense counsel?

21         A.     Most of the time, yes.

22         Q.     So you were willing to have him represent

23   you on appeal then?

24         A.     Yes.

25         Q.     Okay.  I'm going to hand you what I've

```
 1     marked as Exhibit 1 --
 2                         (Exhibit No. 1 was marked
 3                          for identification.)
 4          Q.    -- Deposition Exhibit 1, and ask if you
 5     would read it.  And then I'll ask you some questions.
 6          A.    (Witness complied.)
 7          Q.    Do you recognize this document?
 8          A.    Yes.
 9          Q.    Do you recall executing that affidavit?
10          A.    Signing it, yes.
11          Q.    Yes?
12          A.    Yes.
13          Q.    That is your signature on the bottom?
14          A.    Yes.
15          Q.    Do you today still stand by everything
16     that's in the affidavit?
17          A.    Yes.
18          Q.    So there's nothing in the affidavit that
19     you today believe not to be the truth?
20          A.    Not that I can see.
21          Q.    Okay.  Let me ask you about line 5, "I was
22     advised of my appellate rights and I told my attorney to
23     file an appeal on my behalf."
24                Who advised you of your appellate rights?
25          A.    The judge.
```

1          Q.    Mr. Perkins also advise you of your

2     appellate rights?

3          A.    No.

4          Q.    Did you understand what the judge told you

5     about your appellate rights?

6          A.    I understood it.  I could appeal.

7          Q.    So it's fair to say that this habeas corpus

8     petition is not a claim that you were not informed of

9     your right to appeal; is that a fair statement?

10         A.    I don't understand the question.

11         Q.    I'm asking you, is it fair to say that this

12    habeas corpus action, you're not claiming that you did

13    not know that you had a right to appeal?  You did know

14    you had a right to appeal?

15         A.    Yes, I did.

16         Q.    Okay.  Continuing on line 5, you told your

17    attorney to file an appeal on your behalf.  Could you be

18    specific as to what exactly you told Mr. Perkins?

19         A.    The judge said I had a right to appeal.  He

20    asked me did I understand it.  I told him yes.  He asked

21    something else, and then I asked Mr. Perkins a question,

22    and then he told the judge, he said, I'll speak to him

23    about the appeal.  So court was over, and then he said,

24    he was like, right now we don't need to worry about the

25    appeal, I'll be up to talk to you, because of the time he

1    had gave me.

2              So when he came back up, he just

3    basically -- he had a white piece of paper, he showed me

4    how much time I'll do.  But he told me something about

5    the guns, or the way he gave me the gun spec was wrong,

6    some other things.  It was like, I'm going to take care

7    of the appeal, and he was going to get in touch with me.

8         Q.    Did you know how long you had to file an

9    appeal?

10        A.    Did I?

11        Q.    Did you know?

12        A.    No.

13        Q.    Do you know today how long you have to file

14   an appeal if you're convicted?

15        A.    The exact time?

16        Q.    Yes, that's my question.

17        A.    No.

18        Q.    Your answer was no?

19        A.    Yes.

20        Q.    How much did Mr. Perkins tell you that he

21   was going to charge you for this appeal?

22        A.    He didn't.  He just said, I'm going to get

23   in contact with you.

24        Q.    Did you think he was going to do it for

25   free?

```
 1              A.    The appeal?

 2              Q.    Yes.

 3              A.    No.

 4              Q.    So you knew you would have to pay him?

 5              A.    Yes.

 6              Q.    Or somebody would have to pay him?

 7              A.    Yes.   That we would have to pay him

 8      something.

 9              Q.    And you never discussed fees at all?

10              A.    Not at that time, no.

11              Q.    Okay.  He said he would get in touch with

12      you?

13              A.    Yes.

14              Q.    Get in touch with you before he would file

15      an appeal, after he would file an appeal, or how d
```

```
ERROR: syntaxerror
OFFENDING COMMAND: id y

STACK:

0
3.0
32
0
1.0
```

14

```
 1              A.    The appeal?

 2              Q.    Yes.

 3              A.    No.

 4              Q.    So you knew you would have to pay him?

 5              A.    Yes.

 6              Q.    Or somebody would have to pay him?

 7              A.    Yes.   That we would have to pay him

 8    something.

 9              Q.    And you never discussed fees at all?

10              A.    Not at that time, no.

11              Q.    Okay.  He said he would get in touch with

12    you?

13              A.    Yes.

14              Q.    Get in touch with you before he would file

15    an appeal, after he would file an appeal, or how did you

16    understand it?

17              A.    I was thinking that the way to do it -- He

18    was saying, you have 30 days to get from here till here,

19    being the county, from there to prison.  I was thinking

20    he would come over and see me in between now and then.

21              Q.    So you thought he would see you to file --

22    to talk about your appeal?

23              A.    Right.  Because he needs to just walk over.

24    Most of the time he would just walk over.

25              Q.    And did he subsequently come to see you?
```

```
 1              A.   No.

 2              Q.   Have you seen Mr. Perkins since then?

 3              A.   Since --

 4              Q.   I assume -- When was the last time you saw

 5      Mr. Perkins?

 6              A.   '96.

 7              Q.   You were convicted and sentenced; am I

 8      correct?

 9              A.   Right.

10              Q.   The conversation we were just talking about

11      with Mr. Perkins, that was after you had just been

12      sentenced?

13              A.   Right after.

14              Q.   It was in the courthouse?

15              A.   Exactly.

16              Q.   Was that the last time you saw Mr. Perkins?

17              A.   No.

18              Q.   Okay.  When did you subsequently see him?

19              A.   I saw him two times after that.

20              Q.   Where?

21              A.   Like maybe two weeks before I was about to

22      get rode out to CRC, we sat down.  He basically -- He

23      said, I'm handling your appeal.  He asked if I still

24      wanted to appeal.  I was like yes.  He asked me, was the

25      number still the same as far as calling my mother.  I
```

1      said yes.  He was like, I'm going to be in touch with

2      you.  At that time he had like a case that was going on,

3      he told me, because he explained to me he couldn't stay

4      that long.

5                Q.    This is, you were in the county jail then?

6                A.    Yes.

7                Q.    This was two weeks after you were

8      convicted?

9                A.    Two to three weeks.

10               Q.    And he agreed to take your appeal, or he

11     did, or you just again were talking?

12               A.    That's when I told him I wanted the appeal

13     and he said he would take care of it.

14               Q.    Okay.  At that time did you have any idea

15     how much you'd have to pay him?

16               A.    No.

17               Q.    You didn't talk about money at all?

18               A.    Me and him?  No.

19               Q.    Did you talk about the issues you'd raised

20     on appeal?

21               A.    Yes.

22               Q.    What issues did you want to have raised?

23               A.    I thought that he had -- When he said, what

24     do I think about a trial, I told him basically I thought

25     he had gave me too much time.  He was saying that could

1    be true, because he tried to get all the offenses rolled

2    into one, but he was basically saying, right now it's

3    just looking good on the gun spec. He said that was one

4    of the main things he would be looking at.

5         Q.    So you, yourself, had no specific issues

6    you wanted to have raised on appeal?

7              MR. MEYERS:   Well, I would object to

8              any further inquiry.  I don't think getting

9              into what could be the privileged nature of

10             the discussions between Bruce and Perkins

11             about what did or didn't happen on the merits

12             of that trial are a proper scope before this

13             depo.  I don't believe they're material or

14             relevant to the questions at issue before the

15             Federal Court.

16             MR. COLE:   Okay.  I was not getting

17             into the merits of any issues, but asking him

18             to identify specific issues, I believe is

19             relevant.  If he planned what he wanted to

20             have raised or didn't want to have raised is

21             very relevant as to the overall question if

22             he wanted, in fact, to pursue an appeal.

23             MR. MEYERS:   Well, I maintain the

24             objection.  I mean to ask Mr. Woods himself

25             as a lay person, limited formal education,

1          your question, if I remember, was what he

2          wanted appealed, is perilously close to

3          inviting him to talk to you directly about

4          his own sense of whether the underlying

5          conviction was correct or incorrect on the

6          merits, which would entail his discussing --

7              MR. COLE:  Let me re-ask the question,

8          and if you want to lodge the objection, feel

9          free.

10              MR. MEYERS:  All right.

11         Q.    Can you identify any specific issues that

12    you wanted to have raised on appeal?

13              MR. MEYERS:  Well, I object.

14              MR. COLE:  I would ask the court

15          reporter to have, please have him answer the

16          question.

17                     (Court reporter instructed witness

18                      to answer question.)

19              MR. MEYERS:  I, as counsel for

20          Mr. Woods, am advising him not to answer that

21          question at this time.

22              Are you accepting my advice?

23              THE WITNESS:  Yes.

24              MR. MEYERS:  That being said, before we

25          leave here today, if I can have a private

```
1              minute with him, we can perhaps revisit when
2              we're together that question.  But my
3              objection stands.
4                          (Court reporter certifies
5                          question.)
6         Q.    I believe you testified a few moments ago
7    that you saw Mr. Perkins on two occasions after your
8    sentencing?
9         A.    Yes.
10        Q.    What was the second occasion?
11        A.    By that time I had made it to WCI, and me
12   and another inmate were talking.  I knew they had some
13   information that he related to his mother but his mother
14   again related it to his attorney.  Come to find out his
15   attorney was Brian Perkins.  They called me back to court
16   as a witness.
17        Q.    I'm not sure I just followed what you just
18   said.
19        A.    I was at WCI --
20             MR. MEYERS:  Could I ask just for
21             clarification?  Explain, can you, in this
22             answer what you mean when you say you were
23             here at WCI and how that might relate to
24             helping Mr. Cole understand the time frame
25             involved.  In other words, was WCI your first
```

1                parent institution?  Why don't you explain

2                that?

3                A.    I had already left the county jail, went to

4      receiving, did my 30 days at receiving.  Thirty days, two

5      weeks or something like that.  I ended up here at WCI to

6      start my time.

7                      I was on the yard, talking to another

8      inmate.  He was telling me about how his brother was

9      going through a robbery conviction, a robbery case, bank

10     robbery case.  I brought up another inmate's name that I

11     was a cellmate with at the time.  I was like, dude, you

12     told me this dude didn't have nothing to do with it.  But

13     the detectives was expecting him.  He told his mother.

14     Brian Perkins happened to be his lawyer.  And he asked

15     me, would you go to court and explain what the dude told

16     you.

17               Q.    So you testified in a trial where Brian

18     Perkins was defense counsel for somebody; is that what

19     you're saying?

20               A.    Yes.

21               Q.    And you talked to Mr. Perkins at that time?

22               A.    Correct.

23               Q.    How did that come about?  When did you

24     speak with him?

25               A.    When I went back to the county jail.

1              Q.    He came to visit you a second time?

2              A.    He came to visit me on that case.

3              Q.    And this had been over 30 days after your

4    conviction?

5              A.    Yes.  You said 30 days, right?  Yes.

6              Q.    What did you guys talk about?

7              A.    He asked me, how did I know, how did I

8    know -- he gave me the dude's name and --

9              Q.    Let me ask, did you and Mr. Perkins talk

10   about the status of your appeal?

11             A.    No.

12             Q.    Your appeal didn't come up at all?

13             A.    At the end of the -- As I testified, yes,

14   it came up.  Basically he was like, it takes time.

15             Q.    Did he tell you that he had filed an

16   appeal?

17             A.    I believe so.

18             Q.    Did he talk about how much you were going

19   to pay him?

20             A.    At that time, no.

21             Q.    Did you ever talk to Mr. Perkins about

22   paying him for representing you?

23             A.    No.

24             Q.    Did you ever talk to Mr. Perkins about

25   representing you as appointed counsel?

1          A.    On the appeal?

2          Q.    Yes.

3          A.    No.

4          Q.    But you believed he was representing you at

5    that time?

6          A.    He said he was.

7          Q.    Did you ever talk to anybody in your family

8    about paying Mr. Perkins a fee for pursuing an appeal on

9    your behalf?

10         A.    Basically I just -- I let my mother and my

11   aunt know if he asked for the money, let me know what it

12   was so I could pay it back.

13         Q.    And did he ever tell you that he wanted

14   money for an appeal?

15         A.    He -- They said he wasn't taking calls at

16   that time.

17         Q.    So they were unable to reach him?

18         A.    No.  When they did call, he was either out

19   or busy or something.

20         Q.    So to the best of your knowledge, he was

21   never paid by anybody to pursue an appeal?

22         A.    Right.

23         Q.    Okay.  Line 6 of your affidavit, "I told my

24   attorney that I wanted to appeal and expected him to file

25   the necessary appeal papers."

23

1          Tell me if I'm wrong, your response today

2     is that Mr. Perkins said he would do that; is that what

3     your testimony is?

4          A.    Yes.

5          Q.    Then line 8 says, "My trial counsel failed

6     to file notice of appeal."

7                What's your basis for saying that?

8          A.    Are you asking, why did I say that?

9          Q.    What's the basis for that statement?  How

10    did you know that he never filed the notice of appeal?

11         A.    After I wrote the Public Defenders Office,

12    they wrote me back, had me sign some paperwork.  I

13    thought no appeal was filed.

14         Q.    You're telling me that the only reason you

15    believe that no appeal was filed is because the Public

16    Defender told you; is that what you just testified to?

17         A.    No.

18         Q.    Okay.

19         A.    I'm saying this line that you're asking

20    about, what I'm saying is, I agreed to this line but

21    they're not my words.

22         Q.    You're saying the Public Defender wrote

23    that line?

24         A.    After he took my words about my appeal.

25         Q.    So my question is, you agree with that

24

1    line?

2          A.    Yes.

3          Q.    Okay.   What is the basis for your belief

4    that Mr. Perkins failed to file a notice of appeal?

5          A.    I just believe that he didn't.   At that

6    time, I believe no appeal was filed.

7          Q.    How about today?

8          A.    Well, I know now that an appeal was filed,

9    but back then, I mean, I wasn't getting no legal mail, he

10   wasn't accepting calls, so I honestly believed that.

11         Q.    Okay.   In the habeas corpus petition you

12   wrote, and I'm quoting, and I'll show it to you if you

13   wish to see it, you make the statement, "Appointed

14   counsel refused to file an appeal despite repeated

15   requests."   Now you said appointed counsel.   Are you

16   referring to Mr. Perkins?   I'll show you.

17               Do you want me to show you what you wrote?

18   It's right here, highlighted in blue.

19               MR. MEYERS:   When the other Public

20          Defenders lawyers worked for you, this is the

21          actual document that started your federal

22          habeas petition; all right?

23               THE WITNESS:   (Witness nodded.)

24               MR. MEYERS:   This is part of the habeas

25          petition, so Mr. Cole is just asking you

1              about this language.

2         A.    The one that's highlighted?

3         Q.    I would like you to read that, and ask if

4    that's a correct statement?

5         A.    I wouldn't say "refuse."  He never did

6    refuse.

7         Q.    So he never did refuse, so that's an

8    incorrect statement?  And the part about appointed

9    counsel, I assume that's also incorrect; petitioner's

10   appointed counsel (indicating)?

11        A.    The part about him refusing, he never did

12   refuse.

13        Q.    He never refused?

14        A.    No, he just said -- He said, "I'll take

15   care of it."

16        Q.    Okay.  How did you learn that there was no

17   appeal filed?

18             MR. MEYERS:  Can I call a quick time

19             out?

20                            (Short recess.)

21        A.    After I contacted the Public Defenders

22   Office, everything they did, they would send me a copy of

23   it.  And I don't know her name, but she had -- she sent

24   me a copy of the E-mail saying what they was doing, and

25   it said at the top, "No appeal has been filed."

1          Q.    So when you contacted the Public Defender,

2    you thought you had had an appeal pending?

3          A.    I wasn't for sure.

4          Q.    What did you think?

5          A.    Honestly, I thought I didn't have an

6    appeal.

7          Q.    You did not have an appeal?

8          A.    Right.

9          Q.    So when did you first start to believe that

10   you did not have an appeal?

11         A.    For sure?  When did I know I didn't have an

12   appeal for sure?

13         Q.    When did you begin to suspect that you

14   didn't have an appeal?

15         A.    That's a good question.  You're asking for

16   a specific date, time?

17         Q.    Approximate time period that you began to

18   suspect that you did not have an appeal pending?

19         A.    I knew something was wrong when -- it was a

20   person going to court with me at the same time, and I

21   happened to see them on the news, they was talking about

22   the appeal.  And I hadn't gotten a letter or nothing, so

23   I --

24         Q.    When was this?

25         A.    I don't know the approximate time.  It had

1    to be when I was at Lucasville because I was watching TV

2    and it was right there.

3            Q.    When were you in Lucasville?

4            A.    It had to be.

5            Q.    When were you in Lucasville?

6            A.    '98, '99.

7            Q.    You contacted the Public Defender in

8    February of '98?

9            A.    I did?

10           Q.    Correct?

11           A.    Right.

12           Q.    And you were convicted in June of '96, am a

13    correct?

14           A.    Correct.

15           Q.    So my question again is, when did you begin

16    to suspect that you, in fact, did not have an appeal?

17    I'm not asking for a date, I'm asking for an approximate

18    month, even season, if you want.

19           A.    I'm not for sure.

20           Q.    So your testimony today is, is it fair to

21    say that you have no idea whatsoever when you began to

22    suspect that you didn't have an appeal pending?

23           A.    I knew that.  I knew the fact that I wasn't

24    getting any legal mail and everybody else was.  When they

25    called your name for legal mail and I kept getting passed

1        over, I knew something was wrong.  I also knew that when

2        I would call home and I would say, did you call

3        Mr. Perkins, they would say, he's not there, he's out of

4        the office.  I knew something was wrong.

5                Q.    So they said that pretty much from day one?

6                A.    What?

7                Q.    That they were, from day one they were

8        telling you they were having no contact with Mr. Perkins?

9                A.    No.  He would come and see me, but I'm

10       saying once I got to the penitentiary

11               Q.    Once you were in the penitentiary after you

12       were convicted, from then on you had no contact with

13       Mr. Perkins?

14               A.    Correct.

15               Q.    And your family had no contact with

16       Mr. Perkins?

17               A.    Correct.

18               Q.    So you began to suspect fairly soon that

19       something might be going wrong then?

20               A.    I waited.  I waited -- From the time I got

21       to the penitentiary, I waited.  Not because I wanted to.

22               Q.    Are we talking days, weeks, months?  What

23       are we talking about here?

24               A.    Months, maybe a year.  Because I didn't, I

25       didn't actually know what was going on until later on.

1      When I didn't understand it, basically I had just shut

2      down.  They called it depression, I'm guessing, if you

3      want to call it that.  I snapped out of it like, you

4      know, there was a reason why you didn't know because you

5      were sleeping all the time, you were just shut down.  But

6      I eventually woke up and I said, something ain't right.

7      But as far as a date, I don't know.  If I had to give a

8      date, I would say '98.

9              Q.    Well, that would be after you contacted the

10     Public Defender?

11             A.    When did I contact them?

12             Q.    February of '98.

13             A.    That would be the year.

14             Q.    And prior to that you're saying you just

15     weren't sure because you shut down; is that what you're

16     saying?

17             A.    Yes.

18             Q.    So throughout 1997, it's your testimony

19     that you were uncertain whether or not you had an appeal

20     or not?

21             A.    Well, I had saw Brian Perkins in '96, and

22     he already told me that appeals take time, I'm going to

23     take care of it.  I mean he told me this out of his

24     mouth.

25             Q.    Now the people who were trying to call

1    Mr. Perkins, your mother and cousins?

2          A.    Family members.

3          Q.    Family members?  You had regular contact

4    with them?

5          A.    I could call home, yes, they would accept

6    the call.

7          Q.    And you asked them, I assume, is there an

8    appeal pending?

9          A.    No.

10         Q.    Did you ever talk about your appeal with

11   them?

12         A.    I asked them, what did Mr. Perkins say.

13         Q.    And what would they tell you?

14         A.    We haven't talked to him.

15         Q.    Would that -- Did that concern you?

16         A.    Not at first.

17         Q.    Did it concern you after a couple months?

18         A.    No.

19         Q.    When did it start to concern you?

20         A.    About Mr. Perkins?

21         Q.    Yes.

22         A.    When I wasn't getting no legal mail at all.

23         Q.    Did you ever contact anybody in the court

24   to find out if you had an appeal pending?

25         A.    No.

1          Q.    Why not?

2          A.    I didn't know you could.  I mean, who would

3    I write?  The judge?  I don't know.

4          Q.    Could you identify any one event that

5    stands in your mind for when all of a sudden you

6    realized, hey, I don't have an appeal pending?

7          A.    Probably when I, like I said, when I was

8    watching TV and there was -- they was talking about her

9    appeal and we was going to court at the same time.

10         Q.    And this was well before you contacted the

11   Public Defender?

12         A.    It might have been a few months after,

13   month or two after.

14         Q.    After you had already contacted the Public

15   Defender?

16         A.    No.  When I saw it on TV.

17         Q.    That was a couple months after you were

18   convicted?  You tell me.  I won't say another word.

19         A.    When I saw the fact that she was getting an

20   appeal on TV, then I knew something was going on.  So,

21   again, I contacted the Public Defender.  First I went to

22   the law library, and basically they can't give you no law

23   advice but get a Public Defender.

24         Q.    So several months before you contacted the

25   Public Defender, you watched this thing on TV and you

1    began to think, maybe I don't have an appeal; is that

2    what you're saying?

3         A.    Yes.

4         Q.    Did there ever come a time when you learned

5    that a notice of appeal had in fact been filed by

6    Mr. Perkins?

7         A.    Yes.

8         Q.    When did you learn that?

9         A.    Maybe '4, '04.

10        Q.    Within the last year?

11        A.    Yes.

12        Q.    Okay.  Let me show you what I, I am marking

13   as Deposition Exhibit 2

14                          (Exhibit No. 2 was marked for

15                           identification.)

16        Q.    Have you seen this exhibit before?

17        A.    Yes.

18        Q.    When did you first see it?

19        A.    '04.

20        Q.    And prior to 2004, you had no idea that

21   this notice of appeal had been filed?

22        A.    No.

23        Q.    Okay.

24                          (Exhibit No. 3 was marked for

25                           identification.)

1          Q.    Let me show you now what I have marked as

2    Deposition Exhibit 3.  Have you seen this document

3    before?

4          A.    Yes.

5          Q.    And when did you first see this document?

6          A.    '04.

7          Q.    Okay.  You saw Exhibits 2 and 3 at the same

8    time?

9          A.    I saw Exhibit 2 first.

10         Q.    Who showed you these documents?

11         A.    My attorney.

12         Q.    Mr. Perkins?  The Public Defender?  Who are

13   we talking about?

14         A.    Mr. Lee.

15         Q.    Was the Public Defender who was

16   representing you?

17         A.    (Witness nodded.)

18         Q.    Since these weren't known to you, I assume

19   again that you never consulted with the Court of Appeals

20   in any way about this document or any appeal?

21         A.    No.

22         Q.    And you never asked any family member or

23   anybody else to check with the Court of Appeals, either,

24   about if you had an appeal pending.

25                              (Exhibit No. 4 was marked for

1                          identification.)

2          Q.    Okay.  Let me show you what I'm marking as

3    Deposition Exhibit 4, and ask if you could identify this

4    document?

5          A.    Yes.

6          Q.    What is it?

7          A.    A letter I wrote to the Public Defenders

8    Office.

9          Q.    Okay.  Part of the letter, at least to me,

10   is illegible.  I don't know if you can help me with it or

11   not.  Let me read it to you and see if you can tell me

12   what part I can't read.

13                You're saying, "I am what they call

14   indigent.  At this time I am in jail.  I have, I think,

15   80 to a hundred years.  I got that on May 30th, 1996."

16                Am I correct so far in what I've read?

17         A.    Yes.

18         Q.    Could you read the next line for me?  It's,

19   I, something, something, for you to give me a lawyer to

20   serve on my appeal.

21         A.    May 30th, 1996.  "I would like for you to

22   give me a lawyer to work on my appeal.  Can you help me?"

23         Q.    You're saying "I would like"?

24         A.    "For you."

25         Q.    "To give me a lawyer to serve on my

1      appeal"?

2               A.      "To work on my appeal."

3               Q.      "Work"?  Okay.

4                       My understanding is that the Public

5      Defender responded fairly promptly by sending you what

6      I'm marking as Exhibit 5; is that correct?

7               A.      Yes.

8                               (Exhibit No. 5 was marked for

9                               identification.)

10              Q.      I take it you were satisfied with the speed

11     of their response?

12              A.      Yes.

13              Q.      My understanding is that you submitted the

14     questionnaire again fairly promptly, you submitted that

15     back to them.  I don't want to know the specifics of what

16     you said, but you communicated with them in a timely

17     manner?

18              A.      Yes.

19              Q.      At that point in time, did you believe that

20     they were representing you?

21              A.      The Public Defenders Office?

22              Q.      Yes.

23              A.      No.

24              Q.      So you did not believe that they were going

25     to at that point in time -- At that point in time you did

1    not believe that they were pursuing an appeal on your

2    behalf in the Ohio courts?

3         A.    No.

4                          (Exhibit No. 6 was marked for

5                          identification.)

6         Q.    Let me show you what I have marked as

7    Exhibit 6, which is a letter, at least part of a letter

8    that you received from Robert Lane of the Ohio Public

9    Defenders Office, and that's dated May 13th, 1998.

10               Is it fair to say that still at this time

11   you did not believe that the appeal was pending?

12        A.    Yes.

13        Q.    Yes, what?

14        A.    I did not believe an appeal was pending at

15   this time.

16        Q.    Were you concerned that from May --

17   February to May there had been no legal action filed on

18   your behalf?  Did that concern you?

19        A.    Did it concern me that they didn't file a

20   legal action?

21        Q.    (Nodded.)

22        A.    No, it didn't concern me.  He had wrote

23   back, so I wasn't concerned.

24                         (Exhibit No. 7 was marked for

25                         identification.)

1          Q.    I'll show you now what I have marked as
2    Deposition Exhibit 7, and that's a letter from Mr. Tom
3    Wetterer, who was apparently taking over your
4    representation on your motion for delayed appeal.
5    Between May 26th and the end of August when your delayed
6    appeal was finally filed.  Did you believe that there was
7    any litigation pending, or did you still believe it was
8    in the research stage?
9          A.    I don't understand the question.
10         Q.    Let me rephrase it.  Mr. Wetterer
11   ultimately filed a delayed appeal motion on your behalf
12   in August of 1998; is that correct?
13         A.    I guess.
14         Q.    Prior to the filing of this delayed appeal
15   motion in August of 1998, you were aware of the fact that
16   no appeal had been filed by the Ohio Public Defender; is
17   that a correct statement?
18         A.    Yes.
19         Q.    And you were not concerned by the delay?
20         A.    I probably just didn't understand what was
21   going on.  The fact that he wrote me back after not
22   getting no legal mail --
23         Q.    Are you aware of the fact that the Ohio
24   Attorney General's Office in this habeas case has taken
25   the position that your habeas corpus petition was not

1    timely filed?

2         A.    Yes.

3         Q.    I know you're not a lawyer, and if you have

4    no understanding, feel free to say so, but what is your

5    understanding of the statute of limitations, the time in

6    which you must file a habeas corpus petition?

7              MR. MEYERS:  I object.  What possible

8              material relevance is the question,

9              especially as phrased, elicited from a lay

10             person, his understanding of statute of

11             limitations in jurisprudence?

12             MR. COLE:  His understanding -- Well,

13             again, we can debate this in front of a

14             judge.  That's what this whole case comes

15             down to is the violation of the one-year

16             statute of limitations.  I want to know if he

17             understood his duty to file in accordance

18             with federal law.

19             MR. MEYERS:  I object and reserve it.

20             You can go ahead and answer, if you can.

21        A.    What was the question again?

22                            (Question read by reporter.)

23        A.    I don't know.

24        Q.    You're saying you have no knowledge one way

25    or the other; is that what "I don't know" means?

```
 1          A.    Yes.

 2          Q.    I'm through here.  I don't know if you want

 3     to ask anything.

 4                MR. MEYERS:  If I can ask a few, maybe

 5                that will stop us from --

 6                MR. COLE:  Maybe I'll come up with

 7                something else.

 8                MR. MEYERS:  -- needing to go to an

 9                evidentiary hearing.

10                MR. COLE:  Sure.

11                          EXAMINATION

12     BY MR. MEYERS:

13          Q.    Bruce, do you remember whether or not

14     when you first got picked up and locked up on this case,

15     before trial did you have an appointed lawyer or did you

16     get Perkins right away?

17          A.    I had an appointed lawyer.

18          Q.    Did you personally have, at that time have

19     any money or own anything that you could have sold for

20     cash so you personally could have afforded a lawyer?

21          A.    No.

22          Q.    How about after you got convicted and you

23     were in need of an appeal; did you personally have any

24     money in a bank anywhere, any kind of money or anything

25     of value that you could have sold for cash so you
```

1       personally could have hired an appeal lawyer?

2              A.    No.

3              Q.    Did your family or other -- whoever was

4       trying to help you pay Perkins for trial, did they lead

5       you to understand that they were willing to pay him for

6       your appeal?

7              A.    Yes.

8              Q.    Did Tom Wetterer, during the time he worked

9       for you and represented you, ever show you what's been

10      marked here today as Depo Exhibit 2 or 3?

11             A.    No.

12             Q.    With respect to what's been marked here

13      today as Depo Exhibit 1, would you clarify again, do you

14      know who actually wrote those words?

15             A.    Mr. Wetterer.

16             Q.    Okay.  Did you understand -- When you

17      signed it as an affidavit, what was your understanding

18      when you signed it as an affidavit?

19             A.    To make sure that I read everything that he

20      wrote down.

21             Q.    Okay.  By the time you signed this

22      affidavit, which the exhibit will teach us was, looks

23      like the 18th day of August of '98; is that right?

24             A.    Yes.

25             Q.    Had Wetterer led you to understand or

1   believe that Perkins failed to file a notice of appeal?

2           A.    No.

3           Q.    Let me ask it again.

4                 MR. COLE:  He answered the question.

5           Q.    When you -- Mr. Cole had asked you to talk

6   with him a bit about what is numbered line 8 on that

7   thing.

8           A.    Uh-huh.

9           Q.    "My trial counsel failed to file a notice

10  of appeal."  Was that the information you were receiving

11  from Wetterer at the time, that there was no notice of

12  appeal filed?

13          A.    Yes.

14          Q.    All right.

15                When Mr. Cole showed you the other,

16  lengthier document that was the copy of your habeas

17  petition, which you don't have right before you right

18  now, but -- did you personally write the words in this

19  habeas petition, by the way?

20          A.    No.

21          Q.    You remember signing it; you did sign the

22  habeas petition, right?

23          A.    Yes.

24          Q.    Were you relying on Wetterer to basically

25  represent you and guide you as your counsel at the time?

```
1              A.      Yes.

2              Q.      Did you -- You were showed Exhibits 4 and

3     5.    Just for the record, by the way, what's marked here

4     today as Exhibit 5, am I correct that that contains one,

5     two, three, four, five, six different sheets of eight and

6     a half by 11 papers stapled in the upper, left hand?

7              A.      Right.

8              Q.      And does your handwriting appear anywhere

9     on pages 2, 3, 4, 5 or 6 of Exhibit 5?

10             A.      Yes.

11             Q.      And is that the information you entered on

12    a form that had been sent to you by the Public Defenders

13    Office?

14             A.      Yes.

15             Q.      Among the information completed, is there

16    any information pertaining to your financial situation at

17    the time in early '98?

18             A.      Yes.

19             Q.      And at the time in early 1998, did you

20    personally have cash or anything of value you could have

21    sold to turn into cash to hire your own appellate lawyer?

22             A.      No.

23             Q.      Throughout the time between when you first

24    wrote your letter and get your first response back from

25    the Public Defenders Office, in fact, if we look on
```

1    Exhibit 5 -- first on Exhibit 4 -- Do you, by the way, on

2    Exhibit 4 did you see a date on that in your own

3    handwriting?

4                MR. COLE:  The exhibits speak for

5                themselves.  I would object to that question.

6                MR. MEYERS:  I don't know how a cold

7                document could speak to handwriting.

8                MR. COLE:  But there's a date on the

9                document.  It's there.

10               MR. MEYERS:  Well, do you see a date on

11               the document in your own handwriting?

12               THE WITNESS:  No.

13               MR. MEYERS: Okay.  You don't happen to

14               have the envelope?

15               MR. COLE:  (Indicating).

16               MR. MEYERS:  Is that the one?  The

17               record will speak for that.

18         Q.    On Exhibit 4, as you look at it today, am I

19    correct for the record that's a single piece of eight and

20    a half by 11 paper that appears to contain a Xerox copy

21    of something in your handwriting; is that right?

22         A.    Right.

23         Q.    And it also contains something at the very

24    top, the number 10/1, dash, the word "client," and some

25    letters circled along with the 2-6-98.  Is any of that

44

1      your handwriting?

2              A.    No.

3              Q.    Okay.   That is -- Did you testify that to

4      your best recollection, that is the first letter you ever

5      sent to the office of the Ohio Public Defender?

6              A.    That I remember.

7              Q.    Okay.   And then Exhibit 5, which we've

8      talked about a minute ago, what date is typed, entered on

9      that?

10             A.    February the 6th, 1998.

11             Q.    Now from your fist -- and I think you told

12     Mr. Cole you remember generally getting a response back

13     pretty quick after the first letter you sent to the

14     Public Defender?

15             A.    Yes.

16             Q.    And over the course of time between your

17     first response back from them and, say, the date you

18     signed this affidavit, do you recall having other

19     contact?   And I think you saw -- what they marked, Mr.

20     Cole, A.G., represented as 7 this morning, that's a

21     letter from Wetterer.   6 is a letter from Lane; correct?

22             A.    Yes.

23             Q.    So overall, were you left with the

24     impression that the Public Defender was ignoring you or

25     that they were responding?

1          A.      Responding quickly.

2          Q.      And were you left with the impression once

3     you realized you had no appeal pending, that you had to

4     get that done on your own without a lawyer, or were you

5     thinking the Public Defender was working towards that

6     direction for you?

7          A.      I thought the Public Defender was working

8     towards it.

9          Q.      Mr. Cole asked you several times in kind of

10    different directions when you first -- if you could have,

11    would you pinpoint a time when a light went off and you

12    realized you didn't have an appeal.  Do you remember

13    those questions?

14         A.      Yes.

15         Q.      Let me ask it this way.  Generally

16    speaking, do you remember whether or not your first

17    letter to the Public Defender was mailed off by you

18    shortly after you formed the understanding that there was

19    something wrong with your appeal, or was it months and

20    months after or what?  Did -- Do you have any way of

21    starting from this document they've marked here today as

22    their Exhibit 4, knowing -- as you've said, that's your

23    first writing to the Public Defender -- looking back in

24    time in your memory to tell us how long before you might

25    have sent that letter you realized there was something

1    wrong with your appeal?

2         A.    When I formed it in my head that something

3    is wrong, I wrote the Public Defender, I'd say kind of

4    quick.

5         Q.    Okay.  I have nothing further.

6              MR. COLE:  Probably only one more

7         question for you, sir, based on Mr. Meyers

8         questions.

9                   RECROSS-EXAMINATION

10   BY MR. COLE:

11        Q.    Did I hear you say that as far as you're

12   concerned, that the Public Defender responded quickly in

13   terms of preparing an appeal for you?

14        A.    I say he responded to my letters.

15        Q.    Do you feel that they responded quickly in

16   terms of filing a delay of motion of appeal in the filing

17   courts?

18        A.    You're saying, do I feel like --

19        Q.    Do you feel that the Ohio Public Defender

20   pursued an appeal on your behalf in the Ohio courts in a

21   quick, timely manner from the time you contacted them in

22   February till the time they filed the appeal in August?

23        A.    I don't know.

24        Q.    You've never lodged any complaints about

25   them not pursuing your appeal in a timely manner; is that

47

```
 1    a fair statement?

 2              A.    Yes.

 3                    MR. MEYERS:  Did you say no or yes?

 4                    MR. COLE:  He said yes.

 5              Q.    Yes, you've never complained?

 6              A.    Yes.

 7              Q.    Yes?

 8              A.    Yes, I've never complained.

 9              Q.    Okay.  Thank you very much for your time.

10                    MR. MEYERS:  Thank you.

11

12                         (Signature waived.)

13                              David Newman

14

15                    (Deposition concluded.)

16

17

18

19

20

21

22

23

24

25
```

1                          CERTIFICATE

2    STATE OF OHIO      :

3                      : SS

4    COUNTY OF CLERMONT:

5         I, Shandy Ehde, court reporter and Notary Public in

6    and for the State of Ohio, do certify that before the

7    giving of his deposition, BRUCE WOODS was by me first

8    duly sworn to depose the truth, the whole truth, nothing

9    but the truth; that the foregoing deposition was given at

10   said time and place by notice and agreement of counsel,

11   that said deposition was taken in stenotypy and

12   transcribed by computer under my supervision, and

13   submission to the witness for signature was expressly

14   waived.

15        I certify that I am neither a relative of, nor

16   attorney for any of the parties to this cause, nor

17   relative or employee of any of their counsel, and have no

18   interest whatever in the result of this action.

19        IN WITNESS WHEREOF, I have set my hand and seal at

20   Cincinnati, Ohio this 4th day of May, 2005.

21

22                              Shandy Ehde

23                          Notary Public - State of Ohio

24   My Commission Expires:

25   August 27, 2007

STATE OF OHIO          )
                       )     SS:     **AFFIDAVIT OF BRUCE WOODS**
COUNTY OF SCIOTO       )

I, Bruce Woods, being duly sworn according to law, state the following:

1.    I am indigent and incarcerated at the Southern Ohio Correctional Institution.

2.    I am the defendant in the matter-captioned **State of Ohio v. Bruce Woods**, Hamilton Common Pleas Case No. B9601386. I pled not guilty, and was convicted following a jury trial.

3.    I am a layman, unskilled in legal practice and unfamiliar with legal procedure.

4.    I did not waive my right to a direct appeal of my conviction.

5.    I was advised of my appellate rights and told my attorney to file an appeal on my behalf.

6.    I told my attorney that I wanted to appeal and expected him to file the necessary appeal papers.

7.    I did not file a notice of appeal because I thought my attorney had filed a notice of appeal in my case.

8.    My trial counsel failed to file a Notice of Appeal.

9.    I did not receive any correspondence from my attorney about my appeal. After my sentencing, my trial attorney refused my phone calls, and calls made by my people.

10.   When I arrived in prison I became depressed about doing a lot of time and felt suicidal. I lost hope in the system.

11.   Other inmates told me that it takes several months before the transcript is filed and can take years for an appeal to be decided. I expected that the appeal would take years to be decided so it took me a long time before I became concerned about not hearing about a ruling on my case.

12    When I did learn that no appeal had been filed by my attorney for my conviction, I contacted the Office of the Ohio Public Defender and asked for assistance in filing a delayed appeal.

Further Affiant sayeth naught.

_Bruce Woods_
BRUCE WOODS

Sworn to and subscribed before me this 18th day of August 1998.

Allen Bruce
Notary Public—Ohio
My Commission Expires
February 1999

_____
NOTARY PUBLIC

Deposition
Exhibit
1



IN THE COURT OF COMMON PLEAS
CRIMINAL DIVISION
HAMILTON COUNTY, OHIO          C960545

STATE OF OHIO,                    :        Case No.: B9600345

     Plaintiff-Appellee,            :        (Judge O'Connor)

vs.                               :        **NOTICE OF APPEAL**

BRUCE WOODS                       :

     Defendant-Appellant           :

---

    Notice is hereby given that Dale Lusby, Defendant-Appellant, hereby appeals to the First Appellate Judicial District, from the judgment and sentence of this Court entered on this cause on June 14, 1996.

Respectfully Submitted,

Bryan R. Perkins (0061871)
Attorney for Defendant-Appellant
23 East Seventh Street
Suite 1116
Cincinnati, Ohio 45202
(513)929-4449

```
ORIG. COMP. PARTIES, SUMMONS
( ) CERT MAIL     ( ) SHERIFF     ( ) WAVE
( ) PROCESS SERVER  (✓) NONE
CLERKS FEES _____
SECURITY FOR COST _____
DEPOSITED BY  6/871
FILING CODE   A-105
```

CERTIFICATE OF SERVICE

    I hereby certify that a true and accurate copy of the foregoing Notice of Appeal was served upon the Hamilton County Prosecutor's Office by personal service on this ___ day of July, 1996.

Bryan R. Perkins





EXHIBIT
Deposition
2

(23)

# IN THE COURT OF APPEALS

## FIRST APPELLATE DISTRICT OF OHIO

### HAMILTON COUNTY, OHIO

STATE OF OHIO         :

  Appellee,

vs.

BRUCE WOODS

  Appellant.

APPEAL NO: C-960545
TRIAL NO. B-9600345

<u>ENTRY DISMISSING APPEAL</u>

This cause came on to be considered upon the appeal from the trial court, and

The Court, being fully advised, *sua sponte* dismisses the appeal for failure of the appellant to show good cause why he has failed to comply with the Ohio Rules of Appellate Procedure, to wit:  the transcript of proceedings was due to be filed on 11/19/96.

It is further Ordered that a certified copy of this judgment shall constitute the mandate to the trial court pursuant to Rule 27, Ohio Rules of Appellate Procedure.

TO THE CLERK:

ENTER UPON THE JOURNAL OF

THE COURT _12/5/96_

PER ORDER OF THE COURT.

BY: _____

    Presiding Judge

(COPIES SENT TO ALL COUNSEL)

EXHIBIT Deposition 3

101- CLIENT
(QIFS)

2·6·98

Dear Sir,

I am what they call INDIGENT. At this time. I'm in Jail. I have ... I think 80 to 100 year's. I got that on May 30, 1996, I would like for you to give me a layment to work on my appeal, can you help me

Thank you

Bruce

I am at

Bruce Moore # 329989
P.O. Box 45199
Lucasville, OH.O
45699

Deposition Exhibit 4

PENGAD-Bayonne, N. J.

D. WOODS # 327981

"SOUTHERN OHIO CORRECTIONAL FACILITY
PO BOX 45699
LUCASVILLE, OH 45699-0001
DRC 1459

Office of the Ohio Public Defender
Prison Legal Services
8 East Long Street
Columbus, Ohio 43215-2998



**Office of the Ohio Public Defender**
8 East Long Street
Columbus, Ohio 43215-2998
(614) 466-5394
FAX NUMBER: (614) 728-8091

DAVID H. BODIKER
State Public Defender

# MEMORANDUM

DATE:      February 6, 1998

TO:          Ohio Inmate

FROM:     Intake Division

RE:           Request for Assistance

     This will acknowledge receipt of your request for legal assistance. It is the duty of this office to provide legal representation to indigent inmates who are unlawfully imprisoned, provided their claims have arguable merit.

     Please complete and return the enclosed questionnaire and financial statement. If you have any other documents or information pertaining to your claims, you may send them also. Upon receipt of the questionnaire and financial statement, this office will review your claims for merit.

     Return the documents to:

Intake Division
Office of the Ohio Public Defender
8 East Long Street
Columbus, Ohio  43215

We look forward to hearing from you.



mjb/57321

**OFFICE OF THE OHIO PUBLIC DEFENDER**
8 East Long Street, 11th Floor
Columbus, Ohio  43215

*2.13.98*

Please answer each question below as completely and accurately as possible.  If you need help, contact the law clerk at your institutional law library.  If you need more space, attach additional pages.

Return the completed questionnaire, together with copies of any papers or documents you have pertaining to your case, and this office will investigate your claims.  If the attorney assigned to your case feels an interview is necessary, you will be notified.

Name: _Bruce Woods_   OPDC No.: _98-1640_

Institution Number: _329889_   Date of birth: _10.19.66_

Institution: _S.O.C.F_   Soc. Sec. No.: _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_

County of conviction: _Hamilton_   Case number: _B9601396_

Name of the attorney who represented you:   _98-16-0276_

Any aliases you have used: _____

Any co-defendants in your case: _Kelly Woods - Rayshawn Riggins_

*CLOSED IN INTAKE*

How were you convicted?  [Place an "X" in the appropriate box.  Choose only one box.]

[ ] I entered a plea of "guilty."   [X] I was tried by a jury.

[ ] I entered a plea of "no contest."   [ ] I was tried by a judge, without a jury.

I was convicted of: _Agg. Burglary, Agg. Robbery, Kidnapping_

The term of my sentence is minimum _65½_ to maximum _120_ ; or definite _____

Date of conviction: _5.31.96_   Date delivered to the state: _6.25.96_   Parole/EDS: _2018_

Did you appeal your conviction to the court of appeals?   [ ] Yes [✓] No

Did you appeal your conviction to the Ohio Supreme Court?   [ ] Yes [✓] No

Have you filed any other actions challenging your conviction?   [ ] Yes [✓] No   If so, list the court, case number and nature of the proceedings: _____

_____

Do you have any action pending at the present time? [ ] Yes [✓] No   If so, list the court, case number, type of action, and the name of your attorney, if you are represented: _____

_____

**NOTE:** If you are not represented by counsel, you must continue to represent yourself while this office investigates your case.

Briefly summarize the facts of your case:_

What type of assistance are you requesting from this office?_

## WAIVER

    I hereby waive the attorney-client privilege for the limited purpose of enabling any attorney who has represented me to freely discuss my case with the Ohio Public Defender or any of his staff.

*Bruce Wood*
**Your Signature**

#45489

**OFFICE OF THE OHIO PUBLIC DEFENDER**
8 East Long Street, 11th Floor
Columbus, Ohio 43215

<u>**FINANCIAL STATEMENT**</u>

Before this office can represent you, you MUST COMPLETELY FILL OUT this form and return it to the above address. If a question is not applicable to you or your situation, write N/A in the blank space.

---

## PERSONAL INFORMATION

Name _Bruce Woods_
Social Security Number _290 70 5302_ Date _2-11-99_
Address _P.O. Box 45699_
City _Lucasville_ State _Ohio_ Zip _45699_
Telephone _NA_ Date of Birth _10-13-66_ Marital Status _S_
Names and ages of dependents _NA_

With whom do you live? _NA_

---

## INCOME

Are you working now? ☐ Yes ☑ No
Employer _NA_
Employer's Address _NA_
City _NA_ State _NA_ Zip _NA_
Employer's Telephone _NA_
Type of Work _NA_ Gross Pay $ _NA_ /mo.

List any public assistance or other income received by you or your spouse in the appropriate space below:

| | | |
|---|---|---|
| Type of Public Assistance _NA_ | Gross Pay | $ _NA_ /mo. |
| Pension $ _NA_ /mo. | VA Disability | $ _NA_ /mo. |
| Unemployment Comp. $ _NA_ /mo. | Worker's Comp. | $ _NA_ /mo. |
| Social Security $ _NA_ /mo. | | |
| | **TOTAL** | $ _NA_ /mo. |
| Husband's/Wife's Pay or Income | | $ _NA_ /mo. |
| Other Income (describe) _NA_ | | $ _NA_ /mo. |
| | **TOTAL INCOME** | $ _NA_ /mo. |

---

## ASSETS

Cash on hand or in the bank $ _NA_ /mo.
Money owed to you (explain) _NA_ $ _NA_ /mo.
Do you own your home or any other real estate? ☐ Yes ☑ No
If so, describe property and its location: _____

Value of property $ _NA_ /mo.

List make and year of every car, truck, motorcycle or other vehicle owned by you and the value thereof:
_NA_ $ _NA_ /mo.
_NA_ $ _NA_ /mo.

## ASSETS CON'T

List all other property of value owned by you including but not limited to stocks, bonds, jewelry, boats, musical instruments, and the value thereof.  If none, write NONE:_____ N a _____   $_____ N a _____/mo.

_____   $_____ N A _____/mo.

TOTAL ASSETS   $_____ N a _____/mo.

## EXPENSES

Living Expenses:

| | | |
|---|---|---|
| | Rent or mortgage payments | $_____/mo. |
| | Estimated monthly food bill | $_____/mo. |
| | Medical or dental bills | $_____/mo. |
| | Clothing expenses | $_____/mo. |
| | Utilities | $_____/mo. |

Other expenses (explain)

_____ N a _____   $_____/mo.

_____   $_____/mo.

TOTAL EXPENSES   $_____/mo.

## DEBTS

List all debts you presently owe:

| Names of Creditors/ Who you owe | Total Amount Owed | Monthly Payment |
|---|---|---|
| N a | | |
| | | |
| | | |
| | | |
| | | |

(Attach additional sheets if necessary)

THE FINANCIAL STATEMENT I HAVE COMPLETED ABOVE IS COMPLETE AND ACCURATE TO THE BEST OF MY KNOWLEDGE. I UNDERSTAND THAT IF IT IS DETERMINED BY THE STATE PUBLIC DEFENDER, OR BY THE COURT, THAT I WAS NOT ENTITLED TO THE LEGAL REPRESENTATION PROVIDED ME, I MAY BE REQUIRED TO REIMBURSE THE PUBLIC DEFENDER FOR THE COSTS OF REPRESENTATION PROVIDED.  ANY ACTION FILED BY THE PUBLIC DEFENDER TO COLLECT FEES HEREUNDER, MUST BE BROUGHT WITHIN TWO YEARS FROM THE LAST DATE LEGAL REPRESENTATION WAS PROVIDED.

_____
SIGNATURE OF APPLICANT

IF YOUR FINANCIAL SITUATION SHOULD IMPROVE BEFORE THE FINAL DISPOSITION OF THIS CASE, YOU MUST INFORM THE OHIO PUBLIC DEFENDER IMMEDIATELY.

FOR OFFICE USE ONLY - NOT TO BE FILLED OUT BY THE APPLICANT

| | | |
|---|---|---|
| Monthly income minus living expenses | $_____/mo. | |
| Assets minus liabilities | $_____/mo. | |
| Estimated cost of defense | $_____/mo. | |

Eligible for Ohio Public Defender Services   ☐ Yes   ☐ No

_____
CASE ATTORNEY

#45489

me

**ASSETS CO**

List all other property of value owned by you including but not limit
jewelry, boats, musical instruments, and the value thereof. If none,
NONE:                                    N A

_____

_____ TOTAL ASSE

**EXPENSE**

Living Expenses:          Rent or mortgage payments
                          Estimated monthly food bill
                          Medical or dental bills
                          Clothing expenses
                          Utilities

Other expenses (explain)                        N A

_____

_____ TOT

**DEB**

List all debts you presently owe:

Names of Creditors/ Who you owe              To
                        N A
_____
_____
_____
_____

(Attach additional sheets if necessary)

THE FINANCIAL STATEMENT I HAVE COMPLETED ABOV
KNOWLEDGE. I UNDERSTAND THAT IF IT IS DETERMINED B'
WAS NOT ENTITLED TO THE LEGAL REPRESENTATION PRO'
DEFENDER FOR THE COSTS OF REPRESENTATION PROVI
COLLECT FEES HEREUNDER, MUST BE BROUGHT WITHIN T
WAS PROVIDED.

IF YOUR FINANCIAL SITUATION SHOULD IMPROVE BEFORI
THE OHIO PUBLIC DEFENDER IMMEDIATELY.

FOR OFFICE USE ONLY - NOT TO BE FILLED OUT BY THE AF

    Monthly income minus living expenses
    Assets minus liabilities
    Estimated cost of defense

    Eligible for Ohio Public Defender Services    ☐ Yes  ☐ No

#45489

CASE ATTORNEY



Office of the Ohio Public Defender
8 East Long Street
Columbus, Ohio 43215-2998
(614) 466-5394
FAX NUMBER: (614) 752-5167

DAVID H. BODIKER
State Public Defender

May 13, 1998

Mr. Bruce Woods
#329-889
Southern Ohio Correctional Facility
P.O. Box 45699
Lucasville, Ohio 45699

Dear Mr. Woods:

　　This is in response to your recent request for assistance from this office. I am reviewing your case in order to determine whether or not we can represent you in court.

Sincerely,

Robert L. Lane
Chief Appellate Counsel

RLL:mjb/Enclosures/#67561

Deposition
Exhibit
6



**Office of the Ohio Public Defender**
8 East Long Street
Columbus, Ohio 43215-2998
(614) 466-5394
FAX NUMBER: (614) 752-5167

DAVID H. BODIKER
State Public Defender

May 26, 1998

Mr. Bruce Woods
#329-889
Southern Ohio Correctional Facility
P.O. Box 45699
Lucasville, Ohio 45699

Dear Mr. Woods:

Your case has been reassigned to me for filing a motion for delayed appeal.

Sincerely,

Thomas R. Wetterer, Jr.
Assistant State Public Defender

TRW:nlr\68654

Peposition
Exhibit
7