1

1          IN THE UNITED STATES DISTRICT court

2             SOUTHERN DISTRICT OF OHIO

3                 WESTERN DIVISION

4                    - - -

5

6   BRUCE WOODS,              :CIVIL ACTION NO. 1:00cv803

7              Petitioner,     :

8         Vs.                  :

9   WANZA JACKSON,             :

10             Respondent.      : .

11

12                   - - -

13

14       The deposition of **BRUCE WOODS**, Plaintiff herein,

15   taken as on Cross-Examination by the Defendant, pursuant

16   to the Federal Rules of Civil Procedure, notice and

17   agreement of counsel to take deposition at the Warren

18   Correctional Institute, State Route 63, Lebanon, Ohio

19   45036 on Wednesday, April 20, 2005, 10:30 a.m. before

20   Shandy Ehde, a court reporter and Notary Public.

21

22

23

24

25

1  APPEARANCES:

2              ON BEHALF OF THE PLAINTIFF:

3                 **GREGORY W. MEYERS, ESQ.**

4                 Ohio Public Defender's Office

5                 8 East Long Street

6                 Columbus, Ohio 43215

7              ON BEHALF OF THE DEFENDANT:

8                 **STUART A. COLE, ESQ.**

9                 **JERRI FOSNAUGHT, ESQ.**

10                Attorney General's Office

11                150 E. Gay Street

12                Columbus, Ohio 43215

13                     - - -

14       It is stipulated by counsel for the respective

15  parties that the foregoing deposition may be taken at the

16  time and place stated pursuant to the Federal Rules of

17  Civil Procedure and notice and agreement of counsel to

18  take deposition, that proof of the official character and

19  qualification of the notary is waived; that the

20  deposition may be taken in stenotypy by Shandy Ehde,

21  Registered Professional Reporter and Notary Public in and

22  for the State of Ohio and transcribed by computer out of

23  the presence of the witness and submission to the witness

24  for examination and signature was waived.

25

1                               EXHIBITS

2        1    Affidavit                           10

3        2    Notice of Appeal                    31

4        3    Entry dismissing appeal             31

5        4    Letter dated 2/6/98                 33

6        5    Memorandum dated 2/6/98             34

7        6    Letter dated 5/31/98                35

8        7    Letter dated 5/26/98                35

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                          BRUCE WOODS

2      plaintiff herein, being first duly sworn as hereinafter

3      certified, was examined and deposed as follows:

4                      CROSS-EXAMINATION

5      BY MR. COLE:

6           Q.    Morning, Mr. Woods.  My name is Stuart

7      Cole.  I'm here representing the Ohio Attorney General's

8      Office, representing the respondent and warden in this

9      case.  You're here with your attorney, Mr. Meyers, from

10     the Ohio Public Defenders Office.  We're here to take a

11     deposition in the habeas corpus action which you brought

12     in Case No. 1:00cv803; is that correct?

13          A.    Yes, it is.

14          Q.    How have you prepared for this deposition

15     today?

16          A.    Other than getting a letter saying that you

17     was going to be here --

18          Q.    You haven't reread any of the pleadings

19     filed by the parties then?

20          A.    I read Mr. Perkins' deposition.

21          Q.    You did read Mr. Perkins' deposition?

22          A.    Yes.

23          Q.    Was there anything in Mr. Perkins'

24     deposition that you felt was incorrect, disputed?

25          A.    Maybe some minor things.

Case 1:00-cv-00883-SAS-TSB    Document 78-12    Filed 05/06/2005    Page 5 of 50

1        Q.    Such as?

2        A.    Just minor.  I can't remember offhand.

3        Q.    Nothing relating to the sum and substance

4    of your claims in this case?

5        A.    I don't think so.

6        Q.    Okay.  How old are you, Mr. Woods?

7        A.    Thirty-eight.

8        Q.    You're from Cincinnati; is that correct?

9        A.    Yes.

10       Q.    Did you graduate from high school?

11       A.    No.

12       Q.    What was the last grade you completed?

13       A.    Tenth.

14       Q.    You can read and write?

15       A.    Yes.

16       Q.    In your petition, correct me if I'm wrong,

17   you're challenging your current conviction, that of

18   aggravated burglary, robbery and kidnapping?

19       A.    Yes.

20       Q.    Is this your first felony conviction?

21       A.    No, sir.

22       Q.    What was your first felony conviction?

23       A.    I don't know.

24       Q.    Perhaps if I refresh your recollection,

25   could it have been a robbery in December of 1985?

1          A.     That could be correct.

2          Q.     Do you recall whether or not you pled

3     guilty or actually had a trial in that case?

4          A.     I pled guilty.

5          Q.     Do you remember who your attorney was?

6          A.     No.

7          Q.     Did you appeal that conviction?

8          A.     I don't remember.

9          Q.     You may have?

10         A.     No, I don't remember if I appealed it or

11    not.  I don't think so, though.

12         Q.     Okay.  What was your -- Have there been any

13    other additional felony convictions except for that

14    robbery conviction?

15         A.     Yes.

16         Q.     What was that?

17         A.     I had trafficking marijuana and receiving

18    stolen property.

19         Q.     And when was that conviction?

20         A.     Where was it at?

21         Q.     When?

22         A.     '91.

23         Q.     If I were to tell you it was August 13th,

24    1991, you wouldn't dispute that, I take it?

25         A.     You said '91?

1          Q.   I'm saying August 13th, 1991.

2          A.   That sounds correct.

3          Q.   Did you plead guilty or not guilty, if you

4     recall?

5          A.   On the trafficking marijuana, I think it

6     went to trial.

7          Q.   Was it a jury trial?

8          A.   Yes.

9          Q.   And you were found guilty.  Who was your

10    attorney in that trial?

11         A.   I don't remember.

12         Q.   Were these two attorneys in your first and

13    second trial retained or appointed, if you recall?

14         A.   The second one was, he was appointed.  The

15    first one was, too.

16              MR. MEYERS:   Just to clarify, when you

17              say first and second, we're referencing the

18              '85 and '91.

19              MR. COLE:   The '85 robbery and the

20              1991 trafficking marijuana.

21              MR. MEYERS:   Okay.

22         Q.   The trafficking marijuana, did you appeal

23    that conviction?

24         A.   I don't remember.  I doubt it, though.  I

25    don't remember.

Case 1:09-cv-00833-SAS-SB Document 78-12 Filed 05/06/2005 Page 8 of 50

8

1          Q.    So if you did appeal it, you remember

2     nothing whatsoever about the appeal; is that your

3     testimony?

4          A.    Yes.

5          Q.    Okay.  That brings us to your current

6     conviction.  You were represented by Mr. Brian Perkins;

7     is that correct?

8          A.    Yes.

9          Q.    And how did it come that Mr. Perkins became

10    your attorney?

11         A.    Well, he showed up at the Justice Center

12    one day, and then he was like -- he talked to some of the

13    family, they told him a little about the case.  We got to

14    talking and he became my lawyer.

15         Q.    Did somebody hire him or did he just show

16    up one day?

17         A.    He talked to somebody and then he showed

18    up.  And after we talked about the case, he was like,

19    this is what I need.

20         Q.    You say he talked to somebody.  Who did he

21    talk to?

22         A.    I think it was my mother.

23         Q.    So he talked to a member of your family?

24         A.    Right.

25         Q.    A member of your family hired him?

9

         A.   Not until after we talked.

         Q.   Okay.  You talked to him and then a member
of your --

         A.   He told me, he said, this is how much money
I need.  Once this is dropped off, then we'll --

         Q.   How much money did he need?

         A.   The first time.

         Q.   (Nodded.)

         A.   $1,500.

         Q.   So he told you he needed $1,500?

         A.   Yes.

         Q.   And your mother paid him the $1,500?

         A.   I believe so.

         Q.   And then he represented you through trial?

         A.   He came back again, we talked about the
case, what might happen, and then he started representing
me.

         Q.   Was his total fee $1,500?

         A.   No.

         Q.   More?

         A.   The total fee was like 5,000.

         Q.   And who paid him the $5,000?

         A.   It wasn't paid, the whole 5,000.

         Q.   Do you know how much he was paid?

         A.   Maybe 3,000.

1              Q.    Okay.  And who paid him this $3,000?

2              A.    Family members.

3              Q.    Well, you mentioned your mother.  Anybody

4  else pay him, that you know about?

5              A.    Cousin might have paid.

6              Q.    Okay.  So your mother and cousin paid him

7  about $3,000 to the best of your knowledge?

8              A.    Correct.

9              Q.    And to the best of your knowledge, he was

10  not fully paid?

11             A.    No.

12             Q.    And this $5,000 was to represent you

13  through trial?

14             A.    Yes.

15             Q.    Did he ever threaten to withdraw from

16  representing you throughout the trial because he hadn't

17  been paid?

18             A.    No.

19             Q.    Were you generally satisfied with his

20  performance as defense counsel?

21             A.    Most of the time, yes.

22             Q.    So you were willing to have him represent

23  you on appeal then?

24             A.    Yes.

25             Q.    Okay.  I'm going to hand you what I've

```
 1         marked as Exhibit 1 --

 2                            (Exhibit No. 1 was marked

 3                             for identification.)

 4              Q.    -- Deposition Exhibit 1, and ask if you

 5         would read it.  And then I'll ask you some questions.

 6              A.    (Witness complied.)

 7              Q.    Do you recognize this document?

 8              A.    Yes.

 9              Q.    Do you recall executing that affidavit?

10              A.    Signing it, yes.

11              Q.    Yes?

12              A.    Yes.

13              Q.    That is your signature on the bottom?

14              A.    Yes.

15              Q.    Do you today still stand by everything

16         that's in the affidavit?

17              A.    Yes.

18              Q.    So there's nothing in the affidavit that

19         you today believe not to be the truth?

20              A.    Not that I can see.

21              Q.    Okay.  Let me ask you about line 5, "I was

22         advised of my appellate rights and I told my attorney to

23         file an appeal on my behalf."

24                    Who advised you of your appellate rights?

25              A.    The judge.
```

12

1         Q.   Mr. Perkins also advise you of your

2  appellate rights?

3         A.   No.

4         Q.   Did you understand what the judge told you

5  about your appellate rights?

6         A.   I understood it.  I could appeal.

7         Q.   So it's fair to say that this habeas corpus

8  petition is not a claim that you were not informed of

9  your right to appeal; is that a fair statement?

10        A.   I don't understand the question.

11        Q.   I'm asking you, is it fair to say that this

12  habeas corpus action, you're not claiming that you did

13  not know that you had a right to appeal?  You did know

14  you had a right to appeal?

15        A.   Yes, I did.

16        Q.   Okay.  Continuing on line 5, you told your

17  attorney to file an appeal on your behalf.  Could you be

18  specific as to what exactly you told Mr. Perkins?

19        A.   The judge said I had a right to appeal.  He

20  asked me did I understand it.  I told him yes.  He asked

21  something else, and then I asked Mr. Perkins a question,

22  and then he told the judge, he said, I'll speak to him

23  about the appeal.  So court was over, and then he said,

24  he was like, right now we don't need to worry about the

25  appeal, I'll be up to talk to you, because of the time he

1    had gave me.

2              So when he came back up, he just

3    basically -- he had a white piece of paper, he showed me

4    how much time I'll do.  But he told me something about

5    the guns, or the way he gave me the gun spec was wrong,

6    some other things.  It was like, I'm going to take care

7    of the appeal, and he was going to get in touch with me.

8         Q.   Did you know how long you had to file an

9    appeal?

10        A.   Did I?

11        Q.   Did you know?

12        A.   No.

13        Q.   Do you know today how long you have to file

14   an appeal if you're convicted?

15        A.   The exact time?

16        Q.   Yes, that's my question.

17        A.   No.

18        Q.   Your answer was no?

19        A.   Yes.

20        Q.   How much did Mr. Perkins tell you that he

21   was going to charge you for this appeal?

22        A.   He didn't.  He just said, I'm going to get

23   in contact with you.

24        Q.   Did you think he was going to do it for

25   free?

1          A.    The appeal?

2          Q.    Yes.

3          A.    No.

4          Q.    So you knew you would have to pay him?

5          A.    Yes.

6          Q.    Or somebody would have to pay him?

7          A.    Yes.   That we would have to pay him

8    something.

9          Q.    And you never discussed fees at all?

10          A.    Not at that time, no.

11          Q.    Okay.  He said he would get in touch with

12    you?

13          A.    Yes.

14          Q.    Get in touch with you before he would file

15    an appeal, after he would file an appeal, or how d

ERROR: syntaxerror
OFFENDING COMMAND: id y

STACK:

0
3.0
32
0
1.0

14

```
1            A.    The appeal?

2            Q.    Yes.

3            A.    No.

4            Q.    So you knew you would have to pay him?

5            A.    Yes.

6            Q.    Or somebody would have to pay him?

7            A.    Yes.  That we would have to pay him

8       something.

9            Q.    And you never discussed fees at all?

10           A.    Not at that time, no.

11           Q.    Okay.  He said he would get in touch with

12      you?

13           A.    Yes.

14           Q.    Get in touch with you before he would file

15      an appeal, after he would file an appeal, or how did you

16      understand it?

17           A.    I was thinking that the way to do it -- He

18      was saying, you have 30 days to get from here till here,

19      being the county, from there to prison.  I was thinking

20      he would come over and see me in between now and then.

21           Q.    So you thought he would see you to file --

22      to talk about your appeal?

23           A.    Right.  Because he needs to just walk over.

24      Most of the time he would just walk over.

25           Q.    And did he subsequently come to see you?
```

1          A.    No.

2          Q.    Have you seen Mr. Perkins since then?

3          A.    Since --

4          Q.    I assume -- When was the last time you saw

5     Mr. Perkins?

6          A.    '96.

7          Q.    You were convicted and sentenced; am I

8     correct?

9          A.    Right.

10         Q.    The conversation we were just talking about

11    with Mr. Perkins, that was after you had just been

12    sentenced?

13         A.    Right after.

14         Q.    It was in the courthouse?

15         A.    Exactly.

16         Q.    Was that the last time you saw Mr. Perkins?

17         A.    No.

18         Q.    Okay.  When did you subsequently see him?

19         A.    I saw him two times after that.

20         Q.    Where?

21         A.    Like maybe two weeks before I was about to

22    get rode out to CRC, we sat down.  He basically -- He

23    said, I'm handling your appeal.  He asked if I still

24    wanted to appeal.  I was like yes.  He asked me, was the

25    number still the same as far as calling my mother.  I

Case 1:00-cv-00833-SST-SEB    Document 179-12    Filed 05/10/2005    Page 18 of 50

1    said yes.  He was like, I'm going to be in touch with

2    you.  At that time he had like a case that was going on,

3    he told me, because he explained to me he couldn't stay

4    that long.

5              Q.    This is, you were in the county jail then?

6              A.    Yes.

7              Q.    This was two weeks after you were

8    convicted?

9              A.    Two to three weeks.

10             Q.    And he agreed to take your appeal, or he

11   did, or you just again were talking?

12             A.    That's when I told him I wanted the appeal

13   and he said he would take care of it.

14             Q.    Okay.  At that time did you have any idea

15   how much you'd have to pay him?

16             A.    No.

17             Q.    You didn't talk about money at all?

18             A.    Me and him?  No.

19             Q.    Did you talk about the issues you'd raised

20   on appeal?

21             A.    Yes.

22             Q.    What issues did you want to have raised?

23             A.    I thought that he had -- When he said, what

24   do I think about a trial, I told him basically I thought

25   he had gave me too much time.  He was saying that could

1    be true, because he tried to get all the offenses rolled

2    into one, but he was basically saying, right now it's

3    just looking good on the gun spec. He said that was one

4    of the main things he would be looking at.

5           Q. So you, yourself, had no specific issues

6    you wanted to have raised on appeal?

7           MR. MEYERS: Well, I would object to

8           any further inquiry. I don't think getting

9           into what could be the privileged nature of

10           the discussions between Bruce and Perkins

11           about what did or didn't happen on the merits

12           of that trial are a proper scope before this

13           depo. I don't believe they're material or

14           relevant to the questions at issue before the

15           Federal Court.

16           MR. COLE: Okay. I was not getting

17           into the merits of any issues, but asking him

18           to identify specific issues, I believe is

19           relevant. If he planned what he wanted to

20           have raised or didn't want to have raised is

21           very relevant as to the overall question if

22           he wanted, in fact, to pursue an appeal.

23           MR. MEYERS: Well, I maintain the

24           objection. I mean to ask Mr. Woods himself

25           as a lay person, limited formal education,

1        your question, if I remember, was what he

2        wanted appealed, is perilously close to

3        inviting him to talk to you directly about

4        his own sense of whether the underlying

5        conviction was correct or incorrect on the

6        merits, which would entail his discussing --

7              MR. COLE:  Let me re-ask the question,

8        and if you want to lodge the objection, feel

9        free.

10             MR. MEYERS:  All right.

11        Q.    Can you identify any specific issues that

12   you wanted to have raised on appeal?

13             MR. MEYERS:  Well, I object.

14             MR. COLE:  I would ask the court

15        reporter to have, please have him answer the

16        question.

17                        (Court reporter instructed witness

18                         to answer question.)

19             MR. MEYERS:  I, as counsel for

20        Mr. Woods, am advising him not to answer that

21        question at this time.

22             Are you accepting my advice?

23             THE WITNESS:  Yes.

24             MR. MEYERS:  That being said, before we

25        leave here today, if I can have a private

Case 1:00-cv-00833-SAS-SEB Document 79-12 Filed 05/10/2005 Page 21 of 50

1           minute with him, we can perhaps revisit when

2           we're together that question.  But my

3           objection stands.

4                         (Court reporter certifies

5                         question.)

6           Q.    I believe you testified a few moments ago

7     that you saw Mr. Perkins on two occasions after your

8     sentencing?

9           A.    Yes.

10          Q.    What was the second occasion?

11          A.    By that time I had made it to WCI, and me

12    and another inmate were talking.  I knew they had some

13    information that he related to his mother but his mother

14    again related it to his attorney.  Come to find out his

15    attorney was Brian Perkins.  They called me back to court

16    as a witness.

17          Q.    I'm not sure I just followed what you just

18    said.

19          A.    I was at WCI --

20                MR. MEYERS:  Could I ask just for

21          clarification?  Explain, can you, in this

22          answer what you mean when you say you were

23          here at WCI and how that might relate to

24          helping Mr. Cole understand the time frame

25          involved.  In other words, was WCI your first

Case 11:00-cv-00880-SAS-TBB    Document 79-12    Filed 05/20/05    Page 22 of 50

1              parent institution?  Why don't you explain

2         that?

3              A.    I had already left the county jail, went to

4    receiving, did my 30 days at receiving.  Thirty days, two

5    weeks or something like that.  I ended up here at WCI to

6    start my time.

7              I was on the yard, talking to another

8    inmate.  He was telling me about how his brother was

9    going through a robbery conviction, a robbery case, bank

10   robbery case.  I brought up another inmate's name that I

11   was a cellmate with at the time.  I was like, dude, you

12   told me this dude didn't have nothing to do with it.  But

13   the detectives was expecting him.  He told his mother.

14   Brian Perkins happened to be his lawyer.  And he asked

15   me, would you go to court and explain what the dude told

16   you.

17              Q.    So you testified in a trial where Brian

18   Perkins was defense counsel for somebody; is that what

19   you're saying?

20              A.    Yes.

21              Q.    And you talked to Mr. Perkins at that time?

22              A.    Correct.

23              Q.    How did that come about?  When did you

24   speak with him?

25              A.    When I went back to the county jail.

```
 1                  Q.    He came to visit you a second time?

 2                  A.    He came to visit me on that case.

 3                  Q.    And this had been over 30 days after your

 4       conviction?

 5                  A.    Yes.  You said 30 days, right?  Yes.

 6                  Q.    What did you guys talk about?

 7                  A.    He asked me, how did I know, how did I

 8       know -- he gave me the dude's name and --

 9                  Q.    Let me ask, did you and Mr. Perkins talk

10       about the status of your appeal?

11                  A.    No.

12                  Q.    Your appeal didn't come up at all?

13                  A.    At the end of the -- As I testified, yes,

14       it came up.  Basically he was like, it takes time.

15                  Q.    Did he tell you that he had filed an

16       appeal?

17                  A.    I believe so.

18                  Q.    Did he talk about how much you were going

19       to pay him?

20                  A.    At that time, no.

21                  Q.    Did you ever talk to Mr. Perkins about

22       paying him for representing you?

23                  A.    No.

24                  Q.    Did you ever talk to Mr. Perkins about

25       representing you as appointed counsel?
```

1    A.    On the appeal?

2    Q.    Yes.

3    A.    No.

4    Q.    But you believed he was representing you at

5    that time?

6    A.    He said he was.

7    Q.    Did you ever talk to anybody in your family

8    about paying Mr. Perkins a fee for pursuing an appeal on

9    your behalf?

10    A.    Basically I just -- I let my mother and my

11    aunt know if he asked for the money, let me know what it

12    was so I could pay it back.

13    Q.    And did he ever tell you that he wanted

14    money for an appeal?

15    A.    He -- They said he wasn't taking calls at

16    that time.

17    Q.    So they were unable to reach him?

18    A.    No.  When they did call, he was either out

19    or busy or something.

20    Q.    So to the best of your knowledge, he was

21    never paid by anybody to pursue an appeal?

22    A.    Right.

23    Q.    Okay.  Line 6 of your affidavit, "I told my

24    attorney that I wanted to appeal and expected him to file

25    the necessary appeal papers."

Case 1:00-cv-00803-SAS-TSB   Document 79-12   Filed 05/10/2005   Page 25 of 50

1          Tell me if I'm wrong, your response today

2     is that Mr. Perkins said he would do that; is that what

3     your testimony is?

4          A.   Yes.

5          Q.   Then line 8 says, "My trial counsel failed

6     to file notice of appeal."

7               What's your basis for saying that?

8          A.   Are you asking, why did I say that?

9          Q.   What's the basis for that statement?  How

10    did you know that he never filed the notice of appeal?

11         A.   After I wrote the Public Defenders Office,

12    they wrote me back, had me sign some paperwork.  I

13    thought no appeal was filed.

14         Q.   You're telling me that the only reason you

15    believe that no appeal was filed is because the Public

16    Defender told you; is that what you just testified to?

17         A.   No.

18         Q.   Okay.

19         A.   I'm saying this line that you're asking

20    about, what I'm saying is, I agreed to this line but

21    they're not my words.

22         Q.   You're saying the Public Defender wrote

23    that line?

24         A.   After he took my words about my appeal.

25         Q.   So my question is, you agree with that

1    line?

2                  A.    Yes.

3                  Q.    Okay.  What is the basis for your belief

4     that Mr. Perkins failed to file a notice of appeal?

5                  A.    I just believe that he didn't.  At that

6     time, I believe no appeal was filed.

7                  Q.    How about today?

8                  A.    Well, I know now that an appeal was filed,

9     but back then, I mean, I wasn't getting no legal mail, he

10    wasn't accepting calls, so I honestly believed that.

11                 Q.    Okay.  In the habeas corpus petition you

12    wrote, and I'm quoting, and I'll show it to you if you

13    wish to see it, you make the statement, "Appointed

14    counsel refused to file an appeal despite repeated

15    requests."  Now you said appointed counsel.  Are you

16    referring to Mr. Perkins?  I'll show you.

17                       Do you want me to show you what you wrote?

18    It's right here, highlighted in blue.

19                       MR. MEYERS:  When the other Public

20                 Defenders lawyers worked for you, this is the

21                 actual document that started your federal

22                 habeas petition; all right?

23                       THE WITNESS:  (Witness nodded.)

24                       MR. MEYERS:  This is part of the habeas

25                 petition, so Mr. Cole is just asking you

Case 1:00-cv-00803-SSB-TSB   Document 79-12   Filed 05/10/2005   Page 27 of 50

1              about this language.

2         A.    The one that's highlighted?

3         Q.    I would like you to read that, and ask if

4    that's a correct statement?

5         A.    I wouldn't say "refuse." He never did

6    refuse.

7         Q.    So he never did refuse, so that's an

8    incorrect statement? And the part about appointed

9    counsel, I assume that's also incorrect; petitioner's

10   appointed counsel (indicating)?

11        A.    The part about him refusing, he never did

12   refuse.

13        Q.    He never refused?

14        A.    No, he just said -- He said, "I'll take

15   care of it."

16        Q.    Okay. How did you learn that there was no

17   appeal filed?

18              MR. MEYERS: Can I call a quick time

19              out?

20                        (Short recess.)

21        A.    After I contacted the Public Defenders

22   Office, everything they did, they would send me a copy of

23   it. And I don't know her name, but she had -- she sent

24   me a copy of the E-mail saying what they was doing, and

25   it said at the top, "No appeal has been filed."

26

1              Q.    So when you contacted the Public Defender,

2     you thought you had had an appeal pending?

3              A.    I wasn't for sure.

4              Q.    What did you think?

5              A.    Honestly, I thought I didn't have an

6     appeal.

7              Q.    You did not have an appeal?

8              A.    Right.

9              Q.    So when did you first start to believe that

10    you did not have an appeal?

11             A.    For sure?  When did I know I didn't have an

12    appeal for sure?

13             Q.    When did you begin to suspect that you

14    didn't have an appeal?

15             A.    That's a good question.  You're asking for

16    a specific date, time?

17             Q.    Approximate time period that you began to

18    suspect that you did not have an appeal pending?

19             A.    I knew something was wrong when -- it was a

20    person going to court with me at the same time, and I

21    happened to see them on the news, they was talking about

22    the appeal.  And I hadn't gotten a letter or nothing, so

23    I --

24             Q.    When was this?

25             A.    I don't know the approximate time.  It had

```
1    to be when I was at Lucasville because I was watching TV
2    and it was right there.
3            Q.    When were you in Lucasville?
4            A.    It had to be.
5            Q.    When were you in Lucasville?
6            A.    '98, '99.
7            Q.    You contacted the Public Defender in
8    February of '98?
9            A.    I did?
10           Q.    Correct?
11           A.    Right.
12           Q.    And you were convicted in June of '96, am a
13   correct?
14           A.    Correct.
15           Q.    So my question again is, when did you begin
16   to suspect that you, in fact, did not have an appeal?
17   I'm not asking for a date, I'm asking for an approximate
18   month, even season, if you want.
19           A.    I'm not for sure.
20           Q.    So your testimony today is, is it fair to
21   say that you have no idea whatsoever when you began to
22   suspect that you didn't have an appeal pending?
23           A.    I knew that.  I knew the fact that I wasn't
24   getting any legal mail and everybody else was.  When they
25   called your name for legal mail and I kept getting passed
```

1   over, I knew something was wrong.  I also knew that when

2   I would call home and I would say, did you call

3   Mr. Perkins, they would say, he's not there, he's out of

4   the office.  I knew something was wrong.

5            Q.   So they said that pretty much from day one?

6            A.   What?

7            Q.   That they were, from day one they were

8   telling you they were having no contact with Mr. Perkins?

9            A.   No.  He would come and see me, but I'm

10   saying once I got to the penitentiary

11            Q.   Once you were in the penitentiary after you

12   were convicted, from then on you had no contact with

13   Mr. Perkins?

14            A.   Correct.

15            Q.   And your family had no contact with

16   Mr. Perkins?

17            A.   Correct.

18            Q.   So you began to suspect fairly soon that

19   something might be going wrong then?

20            A.   I waited.  I waited -- From the time I got

21   to the penitentiary, I waited.  Not because I wanted to.

22            Q.   Are we talking days, weeks, months?  What

23   are we talking about here?

24            A.   Months, maybe a year.  Because I didn't, I

25   didn't actually know what was going on until later on.

1   When I didn't understand it, basically I had just shut

2   down.  They called it depression, I'm guessing, if you

3   want to call it that.  I snapped out of it like, you

4   know, there was a reason why you didn't know because you

5   were sleeping all the time, you were just shut down.  But

6   I eventually woke up and I said, something ain't right.

7   But as far as a date, I don't know.  If I had to give a

8   date, I would say '98.

9           Q.    Well, that would be after you contacted the

10  Public Defender?

11          A.    When did I contact them?

12          Q.    February of '98.

13          A.    That would be the year.

14          Q.    And prior to that you're saying you just

15  weren't sure because you shut down; is that what you're

16  saying?

17          A.    Yes.

18          Q.    So throughout 1997, it's your testimony

19  that you were uncertain whether or not you had an appeal

20  or not?

21          A.    Well, I had saw Brian Perkins in '96, and

22  he already told me that appeals take time, I'm going to

23  take care of it.  I mean he told me this out of his

24  mouth.

25          Q.    Now the people who were trying to call

1    Mr. Perkins, your mother and cousins?

2           A.    Family members.

3           Q.    Family members?  You had regular contact

4    with them?

5           A.    I could call home, yes, they would accept

6    the call.

7           Q.    And you asked them, I assume, is there an

8    appeal pending?

9           A.    No.

10          Q.    Did you ever talk about your appeal with

11   them?

12          A.    I asked them, what did Mr. Perkins say.

13          Q.    And what would they tell you?

14          A.    We haven't talked to him.

15          Q.    Would that -- Did that concern you?

16          A.    Not at first.

17          Q.    Did it concern you after a couple months?

18          A.    No.

19          Q.    When did it start to concern you?

20          A.    About Mr. Perkins?

21          Q.    Yes.

22          A.    When I wasn't getting no legal mail at all.

23          Q.    Did you ever contact anybody in the court

24   to find out if you had an appeal pending?

25          A.    No.

1          Q.    Why not?

2          A.    I didn't know you could.  I mean, who would

3     I write?  The judge?  I don't know.

4          Q.    Could you identify any one event that

5     stands in your mind for when all of a sudden you

6     realized, hey, I don't have an appeal pending?

7          A.    Probably when I, like I said, when I was

8     watching TV and there was -- they was talking about her

9     appeal and we was going to court at the same time.

10         Q.    And this was well before you contacted the

11    Public Defender?

12         A.    It might have been a few months after,

13    month or two after.

14         Q.    After you had already contacted the Public

15    Defender?

16         A.    No.  When I saw it on TV.

17         Q.    That was a couple months after you were

18    convicted?  You tell me.  I won't say another word.

19         A.    When I saw the fact that she was getting an

20    appeal on TV, then I knew something was going on.  So,

21    again, I contacted the Public Defender.  First I went to

22    the law library, and basically they can't give you no law

23    advice but get a Public Defender.

24         Q.    So several months before you contacted the

25    Public Defender, you watched this thing on TV and you

```
1    began to think, maybe I don't have an appeal; is that
2    what you're saying?
3         A.    Yes.
4         Q.    Did there ever come a time when you learned
5    that a notice of appeal had in fact been filed by
6    Mr. Perkins?
7         A.    Yes.
8         Q.    When did you learn that?
9         A.    Maybe '4, '04.
10        Q.    Within the last year?
11        A.    Yes.
12        Q.    Okay.  Let me show you what I, I am marking
13   as Deposition Exhibit 2
14                          (Exhibit No. 2 was marked for
15                           identification.)
16        Q.    Have you seen this exhibit before?
17        A.    Yes.
18        Q.    When did you first see it?
19        A.    '04.
20        Q.    And prior to 2004, you had no idea that
21   this notice of appeal had been filed?
22        A.    No.
23        Q.    Okay.
24                          (Exhibit No. 3 was marked for
25                           identification.)
```

1          Q.    Let me show you now what I have marked as

2     Deposition Exhibit 3.  Have you seen this document

3     before?

4          A.    Yes.

5          Q.    And when did you first see this document?

6          A.    '04.

7          Q.    Okay.  You saw Exhibits 2 and 3 at the same

8     time?

9          A.    I saw Exhibit 2 first.

10         Q.    Who showed you these documents?

11         A.    My attorney.

12         Q.    Mr. Perkins?  The Public Defender?  Who are

13    we talking about?

14         A.    Mr. Lee.

15         Q.    Was the Public Defender who was

16    representing you?

17         A.    (Witness nodded.)

18         Q.    Since these weren't known to you, I assume

19    again that you never consulted with the Court of Appeals

20    in any way about this document or any appeal?

21         A.    No.

22         Q.    And you never asked any family member or

23    anybody else to check with the Court of Appeals, either,

24    about if you had an appeal pending.

25                               (Exhibit No. 4 was marked for

1              identification.)

2         Q.    Okay.  Let me show you what I'm marking as

3    Deposition Exhibit 4, and ask if you could identify this

4    document?

5         A.    Yes.

6         Q.    What is it?

7         A.    A letter I wrote to the Public Defenders

8    Office.

9         Q.    Okay.  Part of the letter, at least to me,

10   is illegible.  I don't know if you can help me with it or

11   not.  Let me read it to you and see if you can tell me

12   what part I can't read.

13              You're saying, "I am what they call

14   indigent.  At this time I am in jail.  I have, I think,

15   80 to a hundred years.  I got that on May 30th, 1996."

16              Am I correct so far in what I've read?

17        A.    Yes.

18        Q.    Could you read the next line for me?  It's,

19   I, something, something, for you to give me a lawyer to

20   serve on my appeal.

21        A.    May 30th, 1996.  "I would like for you to

22   give me a lawyer to work on my appeal.  Can you help me?"

23        Q.    You're saying "I would like"?

24        A.    "For you."

25        Q.    "To give me a lawyer to serve on my

1    appeal"?

2            A.     "To work on my appeal."

3            Q.     "Work"?   Okay.

4                   My understanding is that the Public

5    Defender responded fairly promptly by sending you what

6    I'm marking as Exhibit 5; is that correct?

7            A.     Yes.

8                              (Exhibit No. 5 was marked for

9                              identification.)

10           Q.     I take it you were satisfied with the speed

11   of their response?

12           A.     Yes.

13           Q.     My understanding is that you submitted the

14   questionnaire again fairly promptly, you submitted that

15   back to them.  I don't want to know the specifics of what

16   you said, but you communicated with them in a timely

17   manner?

18           A.     Yes.

19           Q.     At that point in time, did you believe that

20   they were representing you?

21           A.     The Public Defenders Office?

22           Q.     Yes.

23           A.     No.

24           Q.     So you did not believe that they were going

25   to at that point in time -- At that point in time you did

```
1    not believe that they were pursuing an appeal on your

2    behalf in the Ohio courts?

3            A.    No.

4                            (Exhibit No. 6 was marked for

5                            identification.)

6            Q.    Let me show you what I have marked as

7    Exhibit 6, which is a letter, at least part of a letter

8    that you received from Robert Lane of the Ohio Public

9    Defenders Office, and that's dated May 13th, 1998.

10                    Is it fair to say that still at this time

11   you did not believe that the appeal was pending?

12           A.    Yes.

13           Q.    Yes, what?

14           A.    I did not believe an appeal was pending at

15   this time.

16           Q.    Were you concerned that from May --

17   February to May there had been no legal action filed on

18   your behalf?  Did that concern you?

19           A.    Did it concern me that they didn't file a

20   legal action?

21           Q.    (Nodded.)

22           A.    No, it didn't concern me.  He had wrote

23   back, so I wasn't concerned.

24                            (Exhibit No. 7 was marked for

25                            identification.)
```

1          Q.    I'll show you now what I have marked as

2    Deposition Exhibit 7, and that's a letter from Mr. Tom

3    Wetterer, who was apparently taking over your

4    representation on your motion for delayed appeal.

5    Between May 26th and the end of August when your delayed

6    appeal was finally filed.  Did you believe that there was

7    any litigation pending, or did you still believe it was

8    in the research stage?

9          A.    I don't understand the question.

10         Q.    Let me rephrase it.  Mr. Wetterer

11   ultimately filed a delayed appeal motion on your behalf

12   in August of 1998; is that correct?

13         A.    I guess.

14         Q.    Prior to the filing of this delayed appeal

15   motion in August of 1998, you were aware of the fact that

16   no appeal had been filed by the Ohio Public Defender; is

17   that a correct statement?

18         A.    Yes.

19         Q.    And you were not concerned by the delay?

20         A.    I probably just didn't understand what was

21   going on.  The fact that he wrote me back after not

22   getting no legal mail --

23         Q.    Are you aware of the fact that the Ohio

24   Attorney General's Office in this habeas case has taken

25   the position that your habeas corpus petition was not

Case 1:00-cv-00083-SS-TSB   Document 79-12   Filed 05/20/05   Page 40 of 50

1    timely filed?

2         A.    Yes.

3         Q.    I know you're not a lawyer, and if you have

4    no understanding, feel free to say so, but what is your

5    understanding of the statute of limitations, the time in

6    which you must file a habeas corpus petition?

7              MR. MEYERS:  I object.  What possible

8         material relevance is the question,

9         especially as phrased, elicited from a lay

10        person, his understanding of statute of

11        limitations in jurisprudence?

12             MR. COLE:  His understanding -- Well,

13        again, we can debate this in front of a

14        judge.  That's what this whole case comes

15        down to is the violation of the one-year

16        statute of limitations.  I want to know if he

17        understood his duty to file in accordance

18        with federal law.

19             MR. MEYERS:  I object and reserve it.

20        You can go ahead and answer, if you can.

21        A.    What was the question again?

22                        (Question read by reporter.)

23        A.    I don't know.

24        Q.    You're saying you have no knowledge one way

25   or the other; is that what "I don't know" means?

39

```
 1              A.    Yes.

 2              Q.    I'm through here.  I don't know if you want

 3      to ask anything.

 4              MR. MEYERS:  If I can ask a few, maybe

 5              that will stop us from --

 6              MR. COLE:  Maybe I'll come up with

 7              something else.

 8              MR. MEYERS:  -- needing to go to an

 9              evidentiary hearing.

10              MR. COLE:  Sure.

11                          EXAMINATION

12      BY MR. MEYERS:

13              Q.    Bruce, do you remember whether or not

14      when you first got picked up and locked up on this case,

15      before trial did you have an appointed lawyer or did you

16      get Perkins right away?

17              A.    I had an appointed lawyer.

18              Q.    Did you personally have, at that time have

19      any money or own anything that you could have sold for

20      cash so you personally could have afforded a lawyer?

21              A.    No.

22              Q.    How about after you got convicted and you

23      were in need of an appeal; did you personally have any

24      money in a bank anywhere, any kind of money or anything

25      of value that you could have sold for cash so you
```

1    personally could have hired an appeal lawyer?

2        A.    No.

3        Q.    Did your family or other -- whoever was

4    trying to help you pay Perkins for trial, did they lead

5    you to understand that they were willing to pay him for

6    your appeal?

7        A.    Yes.

8        Q.    Did Tom Wetterer, during the time he worked

9    for you and represented you, ever show you what's been

10   marked here today as Depo Exhibit 2 or 3?

11       A.    No.

12       Q.    With respect to what's been marked here

13   today as Depo Exhibit 1, would you clarify again, do you

14   know who actually wrote those words?

15       A.    Mr. Wetterer.

16       Q.    Okay.  Did you understand -- When you

17   signed it as an affidavit, what was your understanding

18   when you signed it as an affidavit?

19       A.    To make sure that I read everything that he

20   wrote down.

21       Q.    Okay.  By the time you signed this

22   affidavit, which the exhibit will teach us was, looks

23   like the 18th day of August of '98; is that right?

24       A.    Yes.

25       Q.    Had Wetterer led you to understand or

1    believe that Perkins failed to file a notice of appeal?

2         A.   No.

3         Q.   Let me ask it again.

4              MR. COLE:   He answered the question.

5         Q.   When you -- Mr. Cole had asked you to talk

6    with him a bit about what is numbered line 8 on that

7    thing.

8         A.   Uh-huh.

9         Q.   "My trial counsel failed to file a notice

10   of appeal."  Was that the information you were receiving

11   from Wetterer at the time, that there was no notice of

12   appeal filed?

13        A.   Yes.

14        Q.   All right.

15             When Mr. Cole showed you the other,

16   lengthier document that was the copy of your habeas

17   petition, which you don't have right before you right

18   now, but -- did you personally write the words in this

19   habeas petition, by the way?

20        A.   No.

21        Q.   You remember signing it; you did sign the

22   habeas petition, right?

23        A.   Yes.

24        Q.   Were you relying on Wetterer to basically

25   represent you and guide you as your counsel at the time?

Case 1:00-cv-00803-SSS-SSB   Document 79-12   Filed 05/10/2005   Page 44 of 50

1           A.      Yes.

2                   Q.      Did you -- You were showed Exhibits 4 and

3       5.   Just for the record, by the way, what's marked here

4       today as Exhibit 5, am I correct that that contains one,

5       two, three, four, five, six different sheets of eight and

6       a half by 11 papers stapled in the upper, left hand?

7           A.      Right.

8                   Q.      And does your handwriting appear anywhere

9       on pages 2, 3, 4, 5 or 6 of Exhibit 5?

10          A.      Yes.

11                  Q.      And is that the information you entered on

12      a form that had been sent to you by the Public Defenders

13      Office?

14          A.      Yes.

15                  Q.      Among the information completed, is there

16      any information pertaining to your financial situation at

17      the time in early '98?

18          A.      Yes.

19                  Q.      And at the time in early 1998, did you

20      personally have cash or anything of value you could have

21      sold to turn into cash to hire your own appellate lawyer?

22          A.      No.

23                  Q.      Throughout the time between when you first

24      wrote your letter and get your first response back from

25      the Public Defenders Office, in fact, if we look on

Case 1:00-cv-00803-SAS-TSB Document 79-12 Filed 05/05/2005 Page 45 of 50

1    Exhibit 5 -- first on Exhibit 4 -- Do you, by the way, on

2    Exhibit 4 did you see a date on that in your own

3    handwriting?

4                   MR. COLE:  The exhibits speak for

5              themselves.  I would object to that question.

6                   MR. MEYERS:  I don't know how a cold

7              document could speak to handwriting.

8                   MR. COLE:  But there's a date on the

9              document.  It's there.

10                  MR. MEYERS:  Well, do you see a date on

11             the document in your own handwriting?

12                  THE WITNESS:  No.

13                  MR. MEYERS: Okay.  You don't happen to

14             have the envelope?

15                  MR. COLE:  (Indicating).

16                  MR. MEYERS:  Is that the one?  The

17             record will speak for that.

18        Q.    On Exhibit 4, as you look at it today, am I

19   correct for the record that's a single piece of eight and

20   a half by 11 paper that appears to contain a Xerox copy

21   of something in your handwriting; is that right?

22        A.    Right.

23        Q.    And it also contains something at the very

24   top, the number 10/1, dash, the word "client," and some

25   letters circled along with the 2-6-98.  Is any of that

44

1    your handwriting?

2         A.    No.

3         Q.    Okay.  That is -- Did you testify that to

4    your best recollection, that is the first letter you ever

5    sent to the office of the Ohio Public Defender?

6         A.    That I remember.

7         Q.    Okay.  And then Exhibit 5, which we've

8    talked about a minute ago, what date is typed, entered on

9    that?

10        A.    February the 6th, 1998.

11        Q.    Now from your fist -- and I think you told

12   Mr. Cole you remember generally getting a response back

13   pretty quick after the first letter you sent to the

14   Public Defender?

15        A.    Yes.

16        Q.    And over the course of time between your

17   first response back from them and, say, the date you

18   signed this affidavit, do you recall having other

19   contact?  And I think you saw -- what they marked, Mr.

20   Cole, A.G., represented as 7 this morning, that's a

21   letter from Wetterer.  6 is a letter from Lane; correct?

22        A.    Yes.

23        Q.    So overall, were you left with the

24   impression that the Public Defender was ignoring you or

25   that they were responding?

1          A.     Responding quickly.

2          Q.     And were you left with the impression once

3    you realized you had no appeal pending, that you had to

4    get that done on your own without a lawyer, or were you

5    thinking the Public Defender was working towards that

6    direction for you?

7          A.     I thought the Public Defender was working

8    towards it.

9          Q.     Mr. Cole asked you several times in kind of

10   different directions when you first -- if you could have,

11   would you pinpoint a time when a light went off and you

12   realized you didn't have an appeal.  Do you remember

13   those questions?

14         A.     Yes.

15         Q.     Let me ask it this way.  Generally

16   speaking, do you remember whether or not your first

17   letter to the Public Defender was mailed off by you

18   shortly after you formed the understanding that there was

19   something wrong with your appeal, or was it months and

20   months after or what?  Did -- Do you have any way of

21   starting from this document they've marked here today as

22   their Exhibit 4, knowing -- as you've said, that's your

23   first writing to the Public Defender -- looking back in

24   time in your memory to tell us how long before you might

25   have sent that letter you realized there was something

46

1    wrong with your appeal?

2           A.    When I formed it in my head that something

3    is wrong, I wrote the Public Defender, I'd say kind of

4    quick.

5           Q.    Okay.  I have nothing further.

6           MR. COLE:  Probably only one more

7           question for you, sir, based on Mr. Meyers

8           questions.

9                     RECROSS-EXAMINATION

10   BY MR. COLE:

11          Q.    Did I hear you say that as far as you're

12   concerned, that the Public Defender responded quickly in

13   terms of preparing an appeal for you?

14          A.    I say he responded to my letters.

15          Q.    Do you feel that they responded quickly in

16   terms of filing a delay of motion of appeal in the filing

17   courts?

18          A.    You're saying, do I feel like --

19          Q.    Do you feel that the Ohio Public Defender

20   pursued an appeal on your behalf in the Ohio courts in a

21   quick, timely manner from the time you contacted them in

22   February till the time they filed the appeal in August?

23          A.    I don't know.

24          Q.    You've never lodged any complaints about

25   them not pursuing your appeal in a timely manner; is that

47

1   a fair statement?

2          A.    Yes.

3                MR. MEYERS:  Did you say no or yes?

4                MR. COLE:  He said yes.

5          Q.    Yes, you've never complained?

6          A.    Yes.

7          Q.    Yes?

8          A.    Yes, I've never complained.

9          Q.    Okay.  Thank you very much for your time.

10               MR. MEYERS:  Thank you.

11

12                      ___(Signature waived.)___

13                           David Newman

14

15                   (Deposition concluded.)

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2       STATE OF OHIO      :

3                          : SS

4       COUNTY OF CLERMONT:

5              I, Shandy Ehde, court reporter and Notary Public in

6       and for the State of Ohio, do certify that before the

7       giving of his deposition, BRUCE WOODS was by me first

8       duly sworn to depose the truth, the whole truth, nothing

9       but the truth; that the foregoing deposition was given at

10      said time and place by notice and agreement of counsel,

11      that said deposition was taken in stenotypy and

12      transcribed by computer under my supervision, and

13      submission to the witness for signature was expressly

14      waived.

15             I certify that I am neither a relative of, nor

16      attorney for any of the parties to this cause, nor

17      relative or employee of any of their counsel, and have no

18      interest whatever in the result of this action.

19             IN WITNESS WHEREOF, I have set my hand and seal at

20      Cincinnati, Ohio this 4th day of May, 2005.

21

22                                 Shandy Ehde

23                                 Notary Public - State of Ohio

24      My Commission Expires:

25      August 27, 2007